804 P.2d 787

Samuel W. SHOEN, M.D.; Mary Anna Shoen–Eaton; Cecilia M. Shoen Hanlon; Katrina M. Shoen; Theresa M. Shoen; Leonard S. Shoen; and the following Arizona corporations: Samwill, Inc.; Cemar, Inc.; Kattydid, Inc.; Thermar, Inc.; and L.S.S., Inc., Plaintiffs–Appellants,

v.

Edward J. SHOEN; Paul F. Shoen; James P. Shoen; Aubrey K. Johnson; William E. Carty; John M. Dodds; Gary B. Horton; Henry E. Martin; Harry B. DeShong, Jr.; Gary V. Klinefelter; Amerco, a Nevada corporation; Jim White I–X; John Does I–X; XYZ Corporations I–X; and ABC Partnerships I–X, Defendants–Appellees.

No. 1 CA–CV 89–140.

Court of Appeals of Arizona, Division 1, Department B.

Sept. 18, 1990.

Review Denied Feb. 20, 1991.

Lesher & Borodkin, P.C. by Robert O. Lesher, Tucson, Marvin Johnson, P.C. by Marvin Johnson, Phoenix, for plaintiffs–appellants.

Gibson, Dunn & Crutcher by Dean J. Kitchens, Wayne W. Smith, Robert H. Fairbank, Gail E. Lees, Los Angeles, Cal., and Myers & Barnes by Stephen W. Myers, Phoenix, for defendants-appellees Edward J. Shoen, Paul F. Shoen, James P. Shoen, Aubrey K. Johnson, William E. Carty and John M. Dodds.

Mohr, Hackett, Pedersen, Blakely, Randolph & Haga, P.C. by Robert C. Hackett, David W. Dow, Phoenix, for defendant-appellee Amerco, Inc.

Bryan, Cave, McPheeters & McRoberts by Michael P. Burke, Michael D. Guinan, Phoenix, for defendants-appellees John M. Dodds, Gary B. Horton, Harry B. DeShong, Jr. and Gary V. Klinefelter.

Low & Childers by J. Michael Low, Phoenix, for defendant-appellee Henry E. Martin.

## 60

### OPINION

KLEINSCHMIDT, Judge.

This case arises out of a struggle for control of Amerco Corporation. It is an appeal from the trial court's denial of a preliminary injunction sought by a group of Amerco shareholders to cancel the issuance of certain voting stock, to cancel acts based on the issuance of such stock, and to preclude further voting of the stock in question. We affirm the order of the trial court denying the injunction.

Amerco, a Nevada corporation, owns U–Haul Corporation, which is in the business of renting moving trucks and moving equipment. The business was founded some forty-five years ago by Leonard S. Shoen, who, over a period of time, gave his children most of his Amerco stock.

We will refer to the plaintiffs as the "dissident stockholders' group" and to the defendants as the "directors' group." The dissident stockholders' group is comprised of Leonard S. Shoen; six of his children, including Dr. Samuel W. Shoen; and seven Arizona corporations controlled by these family members. The directors' group includes three of Leonard S. Shoen's sons, including Edward J. Shoen; five stockholder-officers of Amerco; three directors of Amerco, one of whom is also a stockholder-officer; and Amerco itself. Michael Shoen is a member of the dissident stockholders' group although he is not a party to this action. Leonard Shoen's minor son, Scott Shoen, owns a beneficial interest in 1,835.-94 shares of Amerco stock which is held in trust by the United States National Bank of Oregon. Scott Shoen's shares are now aligned with the dissident stockholders' group, but neither Scott nor the bank is a party to this action. Likewise, Mark Shoen and Sophia Shoen are members of the directors' group but are not parties to this action.

For reasons that will emerge, the date July 24, 1988, is significant in this case. As of that day, the dissident stockholders' group, exclusive of the 1,835.94 shares held in trust for Scott Shoen, owned a total of 45,636.48 shares of the company's stock which represented 49.66 percent of the to-tal outstanding shares. The directors' group, again exclusive of the shares held in trust for Scott Shoen, owned a total of 42,086.73 shares representing 45.80 percent of the total outstanding shares. Stockholders outside the family owned 2,341.85 shares which was 2.54 percent of those outstanding. Scott Shoen's interest represented 2.00 percent of the outstanding shares. In addition to the 91,901 outstanding shares, the corporation retained 8,099 treasury shares, making a total of 100,000 authorized shares.

Leadership of Amerco has shifted over the past few years, with each group representing different management styles and corporate goals. Family members have vacillated in their alliances. At the time of the events of interest here, however, the groups were aligned as set forth above. The dissident stockholders' group insists that as of July 24, 1988, the trustee for Scott Shoen was affiliated with their coalition, but this is disputed by the directors' group. We will discuss this secondary dispute in more detail below.

The events at the heart of this dispute occurred over the course of a few weeks in July 1988. On July 17, 1988, all the members of the dissident stockholders' group, except the trustee for Scott Shoen, met and signed an informal, handwritten agreement to join together to "maximize the value and liquidity of their interests in Amerco, and, if feasible at an acceptable value, to investigate a sale of Amerco at the earliest possible opportunity."

In the days following July 17, 1988, Edward J. Shoen, President of Amerco and Chairman of the Board of Directors, became increasingly concerned that the dissident stockholders' group might be planning a hostile takeover or some other action involving Amerco. His suspicion was based on bits and pieces of information about members of the dissident stockholders' group meeting with investment bankers, lawyers, and consultants known for their expertise in the areas of corporate takeover and restructuring. Several Shoen family members reported that the purpose of these meetings was to pursue a sale or

breakup of Amerco. Edward J. Shoen had been told that the dissident stockholders' group had contacted an attorney who specialized in representations involving the breakup of companies. Efforts to obtain additional explicit information from members of the dissident stockholders' group were rebuffed.

Acting on his suspicions, Edward J. Shoen organized several meetings over the weekend of July 23 and 24 with Amerco board members, in-house counsel, and outside attorneys. The meetings were held to devise a strategy to retain control of the corporation. The directors' group took several measures to ensure their control and to preserve the status quo.

First, on July 24, and prior to any formal board action, the five Shoen siblings in the directors' group entered into a written voting trust agreement which provided that for a period of thirty months, the trust members would: (1) vote their stock as a block as directed by a majority of the five members; (2) vote against any corporate sale or merger not unanimously approved; and (3) give James P. Shoen their proxies which allowed him to vote the shares of others in the group if either the number of shareholders attending a meeting was insufficient to produce a majority vote or the shareholders failed to instruct James P. Shoen how they wished the shares voted. The proxies were to be voted against any action which would result in the merger or dissolution of the company, absent unanimous consent otherwise.

The second action by the directors' group was to convene a board of directors meeting on the evening of Sunday, July 24, 1988. The voting trust agreement adopted earlier that day was neither discussed at the meeting nor disclosed to the board. At the meeting, based on outside counsel's recommendation, the board adopted a Key Employee Stock Purchase Plan applicable to five senior Amerco employees. The board valued the 8,099 treasury shares held by the corporation at $2,715 per share. These shares were then committed to the plan and were sold to the five key employees. The price was based on an appraisal

by American Appraisal Associates. Each key employee was required to make a down payment in the amount of the par value of the stock of $100 per share, which amounted to $162,000 each for four of the key employees and $161,900 for the fifth. Edward J. Shoen financed the entire $809,900 down payment for these shares by writing a check from his children's conservatorship funds to each key employee. The balance of the amounts due from the key employees was evidenced by five-year non-recourse promissory notes secured by a pledge of the newly issued stock. As part of the Key Employee Stock Purchase Plan, each key employee was required to grant the board a five-year irrevocable proxy to vote the shares purchased. The board, in turn, gave Edward J. Shoen exclusive authority to vote the proxies. By mutual agreement, these proxies were, however, subsequently revoked on August 3, 1988.

The board also approved outside counsel's suggestions to issue 100,000 shares of preferred stock and to require a two-thirds "supermajority" vote to effect any significant change in the company, such as a merger or sale of substantially all assets. Additional suggestions by outside counsel were considered and rejected. These included the adoption of a "fair price" provision in the corporate charter to prevent a majority from obtaining a control premium without sharing it with the minority. If adopted, such a provision would require that if a large portion of the company were sold, the price paid for all shares must be the same. The board also rejected the suggestions that directors' terms be staggered, and that all or part of the company be sold to a "white knight," i.e., the transfer of a block of stock to a friendly company to deprive the dissident stockholders' group of the ability to take over Amerco. The board also declined to issue an additional one hundred shares of common stock for possible use in a merger or for defensive activity. The meeting then ended.

As a consequence of the activities of July 24, Edward J. Shoen was authorized to vote those shares held by the employees under the Key Employee Stock Purchase Plan and James P. Shoen was authorized to vote

those shares the siblings had placed in the voting trust for a total of 50,185.73 shares, a majority of the 100,000 outstanding shares of Amerco.

After the board meeting, Edward J. Shoen and James P. Shoen held a stockholders' meeting and, pursuant to the Nevada shareholder consent procedure, adopted two amendments to the Amerco Articles of Incorporation: (1) authorizing the issuance of 100,000 shares of preferred stock, and (2) imposing a two-thirds "super-majority" requirement for significant corporate change.

On Monday, July 25, the board met again and recommended to the new majority shareholders that they authorize an additional 7,500 shares of common voting stock to bring the total shares of such stock to 107,500. These additional shares were to be available for an Employee Stock Ownership Plan unrelated to the board's efforts to consolidate its control of the corporation. This recommendation was approved later that same day by Edward J. Shoen and James P. Shoen, by means of the voting trust and the proxies they held. A few days later, the board attached a "poison pill" to the preferred stock which had previously been authorized. Referred to as a "rights plan," it granted the holder of the preferred stock the right to buy shares in any acquiring company at half price, making an unapproved takeover economically disadvantageous to the acquiring company.

On that same Monday, July 25, wholly unaware of the directors' and stockholders' actions of July 24, the dissident stockholders' group filed a Schedule 13D with the Securities and Exchange Commission disclosing their July 17 handwritten agreement, and mailed a copy of the schedule to Amerco.[1] The dissident stockholders' group also retained an investment banking firm to determine Amerco's stock value and to report on "alternatives for maximizing the value and liquidity of all Amerco stock."

On the same day, July 25, the dissident stockholders' group, except the trustee for Scott Shoen, executed a shareholder consent to appoint additional directors and to amend Amerco's By–Laws to protect existing shareholders' rights. The consent was forwarded to the trustee for Scott Shoen who signed it on July 27.

A few days later, still unaware of the actions taken by the directors' group, the dissident stockholders' group delivered to Amerco's secretary the signed shareholders' consent. Only then did the dissident stockholders' group discover what the board had done on July 24 and 25. Amerco's secretary rejected the consent and failed to answer repeated requests for information and details about recent stock issuance from the dissident stockholders' group. Shortly thereafter, the dissident stockholders' group commenced this litigation.

Following an extensive hearing, the trial court denied the request for a preliminary injunction. It found virtually all of the disputed facts in favor of the directors' group and concluded that the law favored their position in every respect. This appeal followed. We will discuss the trial court's findings in more detail below.

## STANDARD OF REVIEW

The scope of our review of an order denying a preliminary injunction is limited to determining whether the trial court committed a clear abuse of discretion. *Financial Assocs., Inc. v. Hub Properties, Inc.,* 143 Ariz. 543, 545, 694 P.2d 831, 833 (App. 1984); *American Credit Bureau, Inc. v. Carter,* 11 Ariz.App. 145, 147, 462 P.2d 838, 840 (1969); *see also Clay v. Arizona Interscholastic Ass'n, Inc.,* 161 Ariz. 474, 476, 779 P.2d 349, 351 (1989). Unless the trial judge either made a mistake of law concerning the duties of corporate directors or clearly erred in finding the facts or applying them to the legal criteria for granting an injunction, we must affirm.

---

**1.** Stockholders who acquire more than 5 percent of certain classes of stock in a corporation are required to file a Schedule 13D with the Securities and Exchange Commission to provide certain information regarding their acquisition of stock. 15 U.S.C.A. § 78m(d) (1981, Supp. 1990).

*Norlin Corp. v. Rooney, Pace Inc.*, 744 F.2d 255, 260–61 (2d Cir.1984); Rule 52(a), Arizona Rules of Civil Procedure.

The party seeking a preliminary injunction is obligated to establish four traditional equitable criteria:

1) A strong likelihood that he will succeed at trial on the merits;

2) The possibility of irreparable injury to him not remediable by damages if the requested relief is not granted;

3) A balance of hardships favors himself; and

4) Public policy favors the injunction.

*Justice v. Nat'l Collegiate Athletic Ass'n*, 577 F.Supp. 356, 363 (D.Ariz.1983); *Burton v. Celentano*, 134 Ariz. 594, 595, 658 P.2d 247, 248 (App.1982).

■ The critical element in this analysis is the relative hardship to the parties. *Justice*, 577 F.Supp. at 363. To meet this burden, the moving party may establish either 1) probable success on the merits and the possibility of irreparable injury; or 2) the presence of serious questions and "the balance of hardships tip sharply" in his favor. *Id.* The type of injunction sought by the dissident stockholders' group is not a remedy favored by the courts, especially because it goes beyond simply maintaining the status quo pending a trial on the merits. *See Burton*, 134 Ariz. at 595, 658 P.2d at 248; *Klaus v. Hi–Shear Corp.*, 528 F.2d 225 (9th Cir.1975).

## THE TRIAL COURT'S FINDINGS

The trial judge issued lengthy Findings of Fact and Conclusions of Law as to the four equitable criteria. Some of the evidence which he reviewed concerned the relative health of the company under the former management of the dissident stockholders' group as opposed to the company's current condition.

The trial judge found that from the information available to it, the board could reasonably have believed that the dissident stockholders' group intended to liquidate the corporation without consulting the board or the management of the corporation. He concluded that the board reasonably feared that even if the company were not sold, the dissident stockholders' group might force a return to old management practices and policies and that the board reasonably feared that unabated family disputes would lead to corporate paralysis. He also found that the board reasonably feared that further managerial instability would damage relations with employees, customers, and lenders.

The trial judge found that the price fixed for the shares of stock issued in conjunction with the Key Employee Stock Purchase Plan was a fair middle-ground figure. The trial judge determined that the adoption of the Key Employee Stock Purchase Plan was proper, done in good faith, and was a valid exercise of the board's business judgement. He found that the plan served to promote the loyal service of key employees and, by placing stock in the neutral hands of non-family members, stabilized a constantly shifting situation where the maintenance of a majority position depended on the whim of disgruntled family members. He concluded that the actions taken by the board were done in good faith and for proper corporate purposes, were not done for the purpose of entrenching management, and were the only immediately available effective means of protecting the corporation.

The trial judge found that the dissident stockholders' group had failed to satisfy its burden as to any of the factors necessary to the granting of a preliminary injunction. He concluded that the dissident stockholders' group would not suffer irreparable harm if the injunction were denied, but the company could suffer serious irreparable harm if the dissident stockholders' group was allowed to return to management or was given the opportunity to sell all or part of the corporation. He also found that an abrupt shift in management could result in financial detriment to the corporation, its employees, and stockholders. The trial judge believed public policy did not favor this and that the possibility that the dissident stockholders' group would succeed on the merits was not strong.

One area in which the trial court made no explicit finding of fact relates to whether, at the time the directors were taking steps to prevent the dissident stockholders' group from gaining control, the dissident stockholders' group in fact owned a majority of the outstanding shares of stock in the corporation. The dissident stockholders' group argues that if the directors of a corporation cause stock to be issued which has the effect of shifting control from a former majority of shareholders to the directors, that action is invalid as a matter of law. *See Frantz Mfg. Co. v. EAC Indus.*, 501 A.2d 401 (Del.1985). This argument is based on the premise that the dissident stockholders' group owned a majority of the outstanding shares on July 24, 1988, the date the board voted to create the Key Employee Stock Purchase Plan and took other steps to consolidate its control.

The directors' group strenuously disputes the truth of this premise. It insists that the shares that were held in trust for Scott Shoen by the United States National Bank of Oregon were not then aligned with the dissident stockholders' group, and that without them the dissident stockholders' group was not the majority shareholder. The directors' group acknowledges that on July 27, the trustee participated with the dissident stockholders' group in signing a Written Consent of Shareholders of Amerco in Lieu of Meeting for the purpose of electing new directors. The directors' group points out, however, that when the dissident stockholders' group met on July 25 to sign the Schedule 13D, group members discussed whether they controlled a majority of the outstanding shares. While the record on this point is confusing, it appears that the dissident stockholders' group did not actually believe it controlled a majority of the outstanding stock as of that date. In any event, the trust officer who ultimately signed the Written Consent of Shareholders of Amerco in Lieu of Meeting had not made up her mind to do so as

of July 24. She actually signed the consent on July 27.

The dissident stockholders' group, in its reply brief, continues to assert that it had the majority of outstanding shares at the time the board took the steps to thwart a takeover, but it does not reply to the specific facts pointed to by the directors' group that support a contrary conclusion. As we have observed, the trial judge made no direct finding one way or another on this point. We do not believe the dissident stockholders' group clearly established its point on this issue. Consequently, some of the cases on which it relies do not directly support its position because the cases involve action taken to deprive majority shareholders of control.[2]

## THE LAW—DEFENSES TO CORPORATE TAKEOVERS

The dissident stockholders' group takes the position that when directors of a corporation issue new stock, they must treat all the stockholders fairly and may not issue stock to themselves or to their nominees for the purpose of gaining or retaining control of the corporation. The dissident stockholders' group cites considerable authority for this proposition, no doubt much of it entirely valid in the context in which it was decided. In the last decade or so, however, a refinement to this rule has grown out of the rash of hostile takeover attempts which American corporations have experienced. The phenomenon, and the evolution in the law to which it has led, is well discussed in *Norlin Corp. v. Rooney, Pace Inc.*, 744 F.2d at 258.

In *Norlin,* the directors of a corporation sought to forestall a hostile takeover by, among other things, creating an employee stock option plan which concentrated greater voting power in the hands of the board. The trial court granted an injunction against the board's exercising control of the corporation in this manner because the

---

**2.** In addition to *Frantz Mfg. Co.,* 501 A.2d 401; see also *Chicago Stadium Corp. v. Scallen,* 530 F.2d 204 (8th Cir.1976); *Hatch v. Emery,* 1 Ariz. App. 142, 400 P.2d 349 (1965); *Kullgren v. Navy Gas & Supply Co.,* 110 Colo. 454, 135 P.2d 1007 (1943); *Canada Southern Oils, Ltd. v. Manabi Exploration Co.,* 96 A.2d 810 (Del.Ch.1953); *Andersen v. Albert & J.M. Anderson Mfg. Co.,* 90 N.E.2d 541 (Mass.1950).

board had failed to demonstrate that its action was fair and served the best interests of the corporation and its shareholders. The court concluded that the action was merely an attempt to entrench the existing board. The court of appeals, on the specific facts of that case, which included the fact that the board's action threatened to cause the New York Stock Exchange to delist the corporation's stock and the fact that the directors offered the shareholders no explanation for their opposition to the takeover, held that the issuance of an injunction was not error. While the appellate court in *Norlin* sustained the injunction, for the problem which confronts us, that case is significant for the rule of law that it adopts.

The court observed that a board member's obligation to the corporation and its shareholders involves a duty of care and a duty of loyalty. The duty of care refers to the responsibility to exercise the care that a reasonably prudent person in a similar position would exercise under similar circumstances. The duty of care is evaluated according to the "business judgment rule," which precludes judicial inquiry into actions taken by a director in good faith and in the exercise of honest judgment in the legitimate and lawful furtherance of a corporate purpose.

■ The director's second duty, that of loyalty, springs from the prohibition against self-dealing that is inherent in a director's fiduciary relationship with the corporation and its shareholders. Once there is a prima facie showing that a director is personally interested in a corporate transaction, the business judgment rule does not apply, and the burden shifts to the director to show that the decision with respect to a particular transaction is fair and serves the best interests of the corporation and the shareholders.

An earlier Second Circuit decision, *Treadway Companies, Inc. v. Care Corp.*, 638 F.2d 357 (2d Cir.1980), upon which the court in *Norlin* relied, contained the observation:

> The cases in this area demonstrate that the courts are sensitive to the risks of self-dealing and abuse which inhere in corporate stock transactions that are intended to affect control. But at the same time courts have recognized that in certain circumstances, it is proper for management to cause the corporation to enter into such transactions. The law in this area is something less than a seamless web; some of the cases are not easily reconciled. We have concluded, however, that far from constituting an area that is beyond the purview of the business judgment rule, these cases are best reconciled by reference to the analysis typically employed under that rule.

*Id.* at 382.

The First Circuit has adopted the same rule expressed in slightly different terms. In *Heit v. Baird*, 567 F.2d 1157 (1st Cir. 1977), a case involving the issuance of stock to impede a hostile takeover, the court said that a director may not exploit his official position to manipulate the issuance of shares solely to perpetuate his own control of the corporation. However, an issuance of stock that has the collateral effect of enhancing the power of the incumbent management is valid if the transaction has as its principal purpose some proper corporate goal. The court said that management not only has the right, but the duty, to resist attempts to win control of the corporation which, if successful, would harm the corporate enterprise. *See also Horwitz v. Southwest Forest Indus., Inc.*, 604 F.Supp. 1130 (D.Nev.1985).

As the court of appeals noted in *Treadway*, other courts have approached the question in a slightly different manner. For example, in *Unocal Corp. v. Mesa Petroleum Co.*, 493 A.2d 946 (Del.1985), the Supreme Court of Delaware considered whether a corporation could make a tender offer for the purchase of its own shares but exclude the corporate raider from participating in the tender offer. The court said that the rule that should govern such situations is as follows: because of the danger that a board might be acting primarily in its own interests, the courts have a duty, before applying the business judgment rule, to require the directors to show

that they had reasonable grounds for believing that corporate policy and effectiveness were threatened by the takeover attempt and that the board's action was reasonable in relation to the threat posed. That burden is satisfied by a showing that the directors were not acting solely or primarily out of a desire to perpetuate themselves in control and that they undertook a reasonable investigation of the circumstances. In *Unocal,* the court found that board's defensive action was proper. *See also Paramount Communications, Inc. v. Time, Inc.,* 571 A.2d 1140 (Del.1989) and 3A *Fletcher Cyc. Corp.* § 1041.3 (Perm.Ed. 1986, 1989).

In our opinion, there is not a great deal of difference between *Norlin* and *Unocal.* Certainly in this case, the findings and conclusions of the trial court address the proper issues, however the burden upon the directors to justify their actions is characterized. We choose to use the analysis employed in *Norlin, Treadway,* and *Heit.* Any law to the contrary, including *Blasius Indus., Inc. v. Atlas Corp.,* 564 A.2d 651 (Del.Ch.1988), upon which the dissident stockholders' group relies, we believe to be distinguishable on the facts or we decline to adopt.

■ We turn then to an examination of whether the directors' actions, as found and characterized by the trial court, can survive the scrutiny of the test of fairness and of being in the best interest of the corporation and its shareholders. Our examination requires us to determine as well whether the trial judge erred in finding the facts as he did. We repeat that it is immaterial in this regard that we might have found the facts differently, as long as the trial judge did not clearly err.

The directors unquestionably had a personal interest in the transaction. While the trial court made no such express finding, any conclusion to the contrary would be untenable. So too, the trial court's finding that the board's actions were not undertaken for the purpose of entrenching management, as far as it goes, is not quite precise enough. These infirmities are not, however, fatal to the trial court's decision.

The fact that the directors had a personal interest in the transaction simply triggers the inquiry as to whether their actions were fair and in the best interests of the corporation and its shareholders. As to entrenching themselves, that was the potential collateral result of the board's actions in every case upon which we rely. The important point is that even if the action entrenches the board, it is permissible if it also serves a proper corporate purpose. *See Heit,* 567 F.2d at 1161. The idea that entrenchment was not the sole reason for the board's action in this case is inherent in the trial court's findings. The conclusions that the board's actions were fair, were undertaken for the best interests of the corporation and the shareholders, and were reasonable in view of the threat posed are either expressly made by the trial judge or inhere in his findings. While the dissident stockholders' group insists that it was not bent on a hostile takeover and vigorously attacks the trial judge's conclusions, we cannot say that the trial judge clearly erred in finding the facts as he did. While the trial court did not articulate its conclusions of law in terms of the decisions which we believe control this question, its findings support its decision under what we believe is the governing law.

### FAILURE TO DISCLOSE THE VOTING TRUST AGREEMENT TO THE BOARD

■ The dissident stockholders' group argues that the failure to disclose to the board that five Shoen siblings had entered into a voting trust agreement deprived the board of information that it needed to make an intelligent decision about the other defensive measures the board was contemplating, and thus invalidated the board's action of July 24.

The dissident stockholders' group, in its opening brief, alludes to the voting trust agreement in detail and attaches a copy of it as Appendix C to the brief. The directors' group states that the agreement is not part of the record. In its reply brief, the dissident stockholders' group discusses the details of the voting trust agreement

without answering the assertion that it is not part of the record. The trial judge did not refer to the voting trust agreement in his Findings of Fact and Conclusions of Law. It is, however, implicit in his finding that the Key Employee Stock Purchase Plan was properly adopted that nothing about the voting trust agreement should invalidate the board's actions of July 24.

We believe that the voting trust agreement is properly before us. It is found in the appendix to the opening brief immediately following the Schedule 13D which the directors' group filed with the Securities and Exchange Commission on August 3, 1988. The voting trust agreement is extensively described in the Schedule 13D, and that document recites that the voting trust agreement is attached to it as an exhibit. The Schedule 13D is exhibit 13, received into evidence on December 13, 1988, and is also exhibit 204 to the deposition of Paul Shoen of August 22, 1988, which was filed with the trial court and is part of the record.

The gist of the dissident stockholders' group's argument is that the voting trust agreement gives each party to it an absolute veto over any proposal to merge or sell Amerco until January 1, 1991, the date the agreement is due to expire. This, the group says, in conjunction with the adoption of the Key Employee Stock Purchase Plan, which assured that the directors' group controlled a majority of the outstanding shares, gave the five siblings who signed the voting trust agreement the power to "control Amerco absolutely, with no corporate action of consequence possible without the unanimous approval of them all."

The dissident stockholders' group cites the testimony of several members of the board who had not been advised of the existence of the voting trust when they voted for the adoption of the Key Employee Stock Purchase Plan. The dissident stockholders' group argues that the information about the voting trust was material to the board's decision. One board member, John M. Dodds, testified that on July 24 he knew nothing of the voting trust agreement. When asked whether it would be appropriate to give a 10 percent shareholder a veto over a transaction involving the sale of the company, he said that would be wrong.[3]

Another director, Aubrey K. Johnson, was also unaware of the voting trust agreement. He said that as a director he would not give a veto power over the sale of the corporation to one shareholder. When asked if it would have been important to him to have known of the voting trust agreement, he said that based on his knowledge of the individuals concerned, it was his personal opinion that the agreement would never be enforced. He said that had he known of the agreement it would have had no significance to him in terms of the action he participated in on July 24 in recommending the requirement for a two-thirds majority of shareholders to approve a significant corporate change.

The dissident stockholders' group cites a single case, *Mills Acquisition Co. v. Macmillan, Inc.*, 559 A.2d 1261 (Del.1988), in support of its argument on this point. In that case, the Supreme Court of Delaware considered the effect of a failure of several members of corporate management to advise the board of their personal financial interest in a corporate restructuring and of their having advised one potential purchaser of another's bid. The court concluded that this misconduct, which was extensive, irremediably tainted the design and execution of the whole restructuring transaction.

The directors' group takes the position that the information about the voting trust agreement was not material to the board's actions of July 24. It points out that its opponents have cited no Nevada or Delaware authority to the effect that directors have a duty to inform the board of their participation in such an agreement. The directors' group concedes that there would have been a duty to tell the board of the agreement if some director had a personal financial stake in a specific transaction that would be influenced by the board's action.

3. Edward J. Shoen owned 10 percent of Amer-   co's shares.

The chief argument which the directors' group makes on this point, however, is that the Key Employee Stock Purchase Plan and the voting trust agreement did not have the effect that the dissident stockholders' group says they did. The directors' group points out that the proxy given to Edward J. Shoen under the Key Employee Stock Purchase Plan would remain in effect "unless otherwise determined by board action." This being true, it says, if Edward J. Shoen tried to block action that the majority of the board favored, all the board had to do was remove his power to vote the 8,099 shares that had been issued pursuant to the Key Employee Stock Purchase Plan.

The dissident stockholders' group's comeback is that as far the directors knew when they voted on the measures adopted on July 24, Edward J. Shoen owned only 10 percent of the outstanding shares of Amerco when in fact, by virtue of the voting trust, he had a proxy to vote 45.80 percent of the stock.[4] Had the board known this, the dissident stockholders' group suggests, it would not have acted as it did.

The dissident stockholders' group, on these briefs and this record, fails to convince us that the preliminary injunction should have been granted because the voting trust agreement was not disclosed to the board. While we would not go so far as to say that the information was immaterial, the undisclosed information was not nearly as important to the board's decision as the information that was withheld in *Mills.* In the case before us, the directors could hardly have been ignorant of the nature of Edward J. Shoen's interest in maintaining control, even if they were not aware of the precise extent to which he had formalized that control. Further, in view of the fact that the board could withdraw the proxy given to Shoen under the Key Employee Stock Purchase Agreement, the dissident stockholders' group exaggerates the extent of that control. We note that no uninformed member of the board has sought to repudiate the board's actions of

July 24, and we are unadvised as to the law as it might relate to a ratification of such actions once the members of the board become aware of the voting trust. Under these circumstances, it would not be advisable for us to try and define the law of the case on this issue. Since this litigation will continue, the parties may wish to pursue and develop this issue further, both as to the facts and as to the applicable law.

## ADEQAUCY OF THE CONSIDERATION FOR THE KEY EMPLOYEE STOCK PURCHASE PLAN

The dissident stockholders' group argues that since the key employees to whom the 8,099 shares were issued paid for those shares with non-recourse promissory notes, the issuance of the shares was void because it was both a sham and fraud and a violation of Nevada statutes.

■ Under the terms of the stock purchase agreement, each of the five key employees paid cash equal to the $100 per share par value of the stock. The balance due for the stock was financed by non-recourse promissory notes. The plan provides that the payee's sole remedy for default is the recovery of the stock for which the note was issued and that the employee has no personal liability for payment. If any key employee fails to pay, the company can declare the note immediately due and payable and may redeem the stock issued by refunding what the employee paid for it.

The dissident stockholders' group argues that all of the circumstances attending the sale of the shares to the key employees, and the board's failure to investigate the ability of the key employees to pay these notes, which it suggests that none of them will ever be able to do, renders the transaction a sham and a fraud.

The directors' group counters with the argument that the trial judge found that a legally enforceable obligation does exist. It points out that there was testimony before the trial judge from a corporate attor-

---

4. We assume that this is an oversight on the part of the dissident stockholders' group. The voting trust agreement gives the proxies to vote the stock to James P. Shoen. The evidence reflects that James P. Shoen exercised those proxies when stockholder votes were taken.

ney that the use of non-recourse notes is common in stock transactions, particularly where the purpose is to give an employee who purchases stock the benefit of a rising stock price without the burden of bankruptcy if the value of the stock fails to rise or decreases.

The directors' group also argues that the employees to whom the stock was issued promised to use their best efforts and that such a promise is not illusory, citing Calamari, *The Law of Contracts* §§ 14–18 (1987). It adds that since the purpose of the stock purchase plan is to generate loyalty and commitment from valued employees, the resulting benefit to Amerco is classic contractual consideration.

It also points out that each employee paid Amerco in excess of $160,000 as a down payment and that the employee could not recoup the interest on that amount were he to fail to pay for his stock and allow the corporation to redeem it. This time-value of the down payment, it argues, benefits the corporation and is a detriment to the key employees. The directors' group also points out that the key employees received no security in return for the par value down payment. As a consequence, they have incurred the risk that as to that amount, nothing protects them against the general creditors of the corporation in the event the corporation cannot meet its obligations.

We conclude that the order of the trial court denying the request for a preliminary injunction ought not be reversed on the grounds that the sale of stock to the key employees was a sham or a fraud. The trial judge found that all of the key employees to whom stock was sold could meet the scheduled interest and principal obligations on the notes by selling some of their shares back to the corporation or to an Employee Stock Option Plan that was being established. He also found that the reason for the sale of the stock was to secure the continued services of the key employees. As we have already concluded, it was not an abuse of discretion to find that such was, indeed, one of the reasons for adopting the plan.

Further, the various benefits and detriments conferred and incurred, mentioned above in our discussion of the arguments advanced by the directors' group, constitute consideration for the issuance of the stock to the key employees. Our decision is bolstered by the expert witness who testified that it was common to finance sales of stock to corporate employees with non-recourse notes. While this testimony was of a very general nature and was not specifically related to Nevada practice, it was uncontradicted. We cannot agree with the dissident stockholders' group on this record that the plan was unquestionably a sham and a fraud.

The more difficult question is whether this transaction violates Nevada statutes, and if so, the consequences of that violation. Nevada Revised Statutes section 78.210 provides *inter alia:*

A corporation ... may issue stock for cash, labor, services or personal property, or real estate of or leases thereof. Any shares issued for such consideration shall be deemed fully paid if:

1. The entire amount; or

2. Not less than the amount characterized by capital pursuant to NRS 78.270 accompanied by the legally enforceable obligation of the subscriber to pay the balance of the subscription, has been received by the corporation.

Section 78.220 provides, *inter alia*, that if there be a subscription default,

the corporation may proceed to collect the amount due in the same manner as any debt due the corporation.... No penalty ... may be declared ... unless the amount due remains unpaid for 30 days after written demand.

Section 78.225 provides, *inter alia:*

Where a ... subscription ... has been made, ... a holder of shares of stock not fully paid shall be personally liable ... not in excess of the amount unpaid....

The dissident stockholders' group argues that these sales violate these provisions because the non-recourse notes are not "legally enforceable obligations to pay" within the meaning of section 78.210. It says that

Amerco and its creditors have no legally enforceable right to hold the key employees to their obligation because the employees can simply decline to pay the balance on the notes and give back the stock. It contends that section 78.210 and section 78.225 of the Nevada statutes read together require that a subscriber to stock who has not paid cash for the full value of the stock must be personally liable for the unpaid balance or the issuance is void.

■ The capital stock of a corporation and the unpaid subscriptions for that stock constitute a trust fund for the benefit of the general creditors of the corporation, and where the law requires a public declaration of the amount of capital upon which the corporation operates, the general public has a right to rely on the truthfulness of such declaration. *See Thompson v. Reno Savings Bank,* 19 Nev. 103, 7 P. 68 (1885).

The directors' group insists that the stock issued to the key employees in this case is fully paid for within the meaning of section 78.210 because cash was paid for the par value of the stock and a legally enforceable obligation to pay was given for the balance of its value. We agree that the notes are enforceable contracts in the sense that if they are not paid, consequences will ensue for the key employees. They will lose their stock and receive back the amount of money they have paid for it. If the stock was realistically valued in the first place and has held that value, or if the stock has risen in value, the corporation may enjoy a benefit, and the makers of the notes may suffer a detriment if the payments on the notes are not met. Certainly, if the stock has risen in value, it would be in the employees' interest to dispose of enough of the stock to allow them to maintain their payments on the rest. If the stock has fallen in value, however, the remedy available to the corporation has little value either to it or to its creditors.

The Nevada statutes require not only that the subscription constitute a legally enforceable obligation, but also that the subscriber must bear personal liability for that obligation. The dissident stockholders' group cites not a single case, from Nevada or elsewhere, which holds that a non-recourse provision in a subscription agreement voids the entire agreement and the corporate act of issuing the stock based on the agreement. Instead, it cites several cases for the proposition that an injunction is appropriate to prevent the issuance of stock in a manner which conflicts with a statute, regardless of the extent of the harm threatened. We analyze those cases briefly.

In *Bank of New York Co. v. Irving Bank Corp.,* 139 Misc.2d 665, 528 N.Y.S.2d 482 (1988), the directors of a corporation attempted to defend against a hostile takeover by adopting a poison pill in the form of a "rights plan" that would limit the powers of any board elected as the result of an unapproved takeover. The court enjoined the execution of this scheme because it violated a statute that required restrictions on the powers of the board to be included in the certificate of incorporation.

*Allen v. Prime Computer, Inc.,* 540 A.2d 417 (Del.1988), dealt with a bylaw adopted by a target corporation to delay for twenty days the effectiveness of certain actions taken by shareholder consent. The court enjoined the enforcement of the bylaw because by statute the right of shareholders to act immediately by consent could only be modified or eliminated by a proviso contained in the certificate of incorporation.

In *Studebaker Corp. v. Gittlin,* 360 F.2d 692 (2d Cir.1966), the court enjoined the use of proxies obtained in violation of the Securities Exchange Act of 1934.

Finally, in *Schwab v. Potter Co.,* 194 N.Y. 409, 87 N.E. 670 (1909), the court held that an attempt by one corporation to create a new corporation in which the first corporation would be the sole shareholder was void as beyond the statutory powers of corporations and could therefore be enjoined.

■ The cases cited do not deal with the issuance of stock. They only support the limited proposition that when directors of a corporation are acting to consolidate their control, their conduct is subject to injunc-

tion if they act contrary to their authority. These cases also address situations in which an injunction appears to have been the only effective remedy the courts could provide. That is not necessarily the case here. First, there is nothing in the Nevada statutes which says that all stock issued must be paid for in full. The very existence of section 78.225 suggests the contrary. It recognizes that not all stock will be paid for in full and prescribes how a subscriber shall be treated should his unpaid balance be needed. Second, the conflict here is between the provisions of the agreement allowing for a non-recourse note and specifying that the corporation may recover the stock upon refund of the amount paid for it on the one hand, and the Nevada statute which declares that subscribers who do not fully pay for their stock are liable to the extent of the unpaid balance on the other. That portion of the agreement which conflicts with the statute may be void. In other words, it may be that in spite of the agreement between the corporation and the key employees that the obligation be non-recourse, the key employees are by virtue of the statute personally liable to the full extent of the unpaid balance of the notes. We understand the directors' group to say as much in its brief, although it is less than clear in doing so. As the directors' group puts it, the statute "requires the imposition of personal liability for the balance of the stock price only when a debtor [sic] sues the corporation and attempts to hold its stockholders individually liable when they have not 'fully paid' for their stock." It then proceeds to assert that there is no law to the effect that an issue of stock is invalid if it is not fully paid.

The dissident stockholders' group has not replied directly to the directors' group's suggestion that the effect of the conflict between the subscription agreement and the statute is not to render the issuance of the stock void, but to render the subscribers personally liable. The dissident stockholders' group cites no authority other than the statute itself. The dissident stockholders' group did not carry its burden, either below or in this court, of showing that the Nevada statute has the consequences for which it contends. We conclude, without purporting to establish the law of the case on this particular point, that the dissident stockholders' group has not established its right to a preliminary injunction because of the way in which the employees agreed to pay for the stock. The parties are entitled to develop this issue further at trial.

## SUMMARY

We adopt the rule of *Norlin Corp. v. Rooney, Pace Inc.* concerning the law as to directors' responsibilities in the face of a hostile takeover attempt. We conclude that the failure of the directors to disclose the voting trust agreement and the possible conflict between the Key Employee Stock Purchase Plan and the Nevada statutes does not mandate the issuance of a preliminary injunction. We do not purport to define the law of the case on the two latter points.

The order of the trial court denying the issuance of a preliminary injunction is affirmed.

JACOBSON, P.J., and LANKFORD, J., concur.