IN THE

# SUPREME COURT OF THE STATE OF ARIZONA

**KAREN FANN, ET AL.**
*Plaintiffs/Appellants,*

*v.*

**STATE OF ARIZONA, ET AL.**
*Defendants/Appellees.*

**INVEST IN ARIZONA, ET AL.**
*Intervenors/Appellees.*

No. CV-21-0058-T/AP
Filed August 19, 2021

Appeal from the Superior Court in Maricopa County
The Honorable John R. Hannah, Judge
No. CV2020-015495
CV2020-015509
**AFFIRMED AND REMANDED WITH INSTRUCTIONS**

Appeal to the Court of Appeals, Division One
No. 1 CA-CV 21-0087
**TRANSFERRED**

COUNSEL:

Timothy Sandefur, Scharf-Norton Center for Constitutional Litigation at the Goldwater Institute, Phoenix; Dominic E. Draye (argued), Greenberg Traurig, L.L.P, Phoenix; and Brett W. Johnson, Colin P. Ahler, Tracy A. Olson, Snell & Wilmer L.L.P., Phoenix, Attorneys for Karen Fann, Russell "Rusty" Bowers, David Gowan, Venden Leach, Regina Cobb, John Kavanagh, Montie Lee, Steve Pierce, Francis Surdakowski, M.D., NO ON 208, and Arizona Free Enterprise Club

Brian M. Bergin (argued), Kevin M. Kasarjian, Bergin, Frakes, Smalley & Oberholtzer PLLC, Phoenix, Attorneys for State of Arizona and Arizona

Department of Revenue

Daniel J. Adelman, Arizona Center for Law in the Public Interest, Phoenix; and Roopali H. Desai, D. Andrew Gaona (argued), Kristen Yost, Coppersmith Brockelman PLC, Phoenix, Attorneys for Invest in Arizona (Sponsored by AEA and Stand for Children) and David Lujan

Joel W. Nomkin, Austin C. Yost, Kathryn E. Boughton, Perkins Coie LLP, Phoenix, Attorneys for Amicus Curiae Arizona School Boards Association

Aaron T. Martin, Martin Law & Mediation PLLC, Phoenix, Attorneys for Amici Curiae Arizona Business Leaders

James E. Barton, II, Jacqueline Mendez Soto, Barton Mendez Soto PLLC, Tempe, Attorneys for Amici Curiae Potential Ballot Initiative Proponents

Mary R. O'Grady, Joshua D. Bendor, Osborn Maledon P.A., Phoenix, Attorneys for Amicus Curiae Superintendent of Public Education Kathy Hoffman

Timothy J. Berg, Emily Ward, Bradley J. Pew, Taylor Burgoon, Fennemore Craig, P.C., Phoenix, Attorneys for Amicus Curiae Arizona Commerce Authority

Gregory W. Falls, Craig A. Morgan, Sherman & Howard L.L.C., Phoenix, Attorneys for Amici Curiae Americans for Tax Reform and Arizona Small Business Association

Rhonda L. Barnes, Jane Ahern, Ben Bryce, Arizona House of Representatives, Phoenix; and Lisette Flores, Arizona State Senate, Phoenix, Attorneys for Amici Curiae Senate Minority Leader Rebecca Rios and House Minority Leader Reginald Bolding

Giselle C. Alexander, The Cavanagh Law Firm, P.A., Phoenix, Attorneys for Amicus Curiae Arizona Farm Bureau Federation

Gregory B. Iannelli, Bryan Cave Leighton Paisner LLP, Phoenix, Attorneys for Amici Curiae Elliott Pollack and Alan Maguire

Susan M. Freeman, Gregory Y. Harris, Lewis Roca Rothgerber Christie LLP,

Phoenix, Attorneys for Amici Curiae Save Our Schools Arizona, Education Law Center, and the Southern Poverty Law Center

Otto S. Shill, III, Jimmie W. Pursell, Jr., Lauren R. Smith, Jennings, Strouss & Salmon, P.L.C., Phoenix, Attorneys for Amici Curiae Arizona Tax Research Association and Arizona Chamber of Commerce and Industry

Tyson C. Langhofer, Alliance Defending Freedom, Scottsdale, Attorneys for Amici Curiae Alliance Defending Freedom and Center for Arizona Policy

Erin Adele Scharff, Phoenix, Attorney for Amicus Curiae Tax Professor Erin Scharff

———————————

CHIEF JUSTICE BRUTINEL authored the opinion of the Court, in which JUSTICES BOLICK, LOPEZ, BEENE, MONTGOMERY and JUDGE MCMURDIE,* joined. VICE CHIEF JUSTICE TIMMER concurred in part and dissented in part.

———————————

¶1　　　　In 2020, Arizona voters passed Proposition 208 ("Prop. 208"), a citizens' initiative imposing an income tax surcharge on "high-income" Arizona taxpayers to provide direct funding to schools. Petitioners sued to challenge the constitutionality of that tax and the initiative's characterization of the direct funding as "grants," exempt from the expenditure limitations of article 9, section 21 of the Arizona Constitution ("Education Expenditure Clause"). Petitioners also sought to enjoin the collection of that tax pending the resolution of their challenge. We hold that the direct funding provision does not fall within the constitutional definition of grants in article 9, section 21 of the Arizona Constitution, and Prop. 208 is therefore unconstitutional to the extent it mandates expending tax revenues in violation of the Education Expenditure Clause. Likewise, the remaining non-revenue related provisions of Prop. 208 are not separately workable and thus not severable. However, because we cannot

———————————

* Before his retirement from the Court, Justice Andrew W. Gould recused himself from this case. Pursuant to art. 6, § 3 of the Arizona constitution, Judge Paul J. McMurdie, Division One, Arizona Court of Appeals, was designated to sit in this matter.

determine at this preliminary stage of the case the extent to which, if any, such funding will exceed the constitutional expenditure limitation, we decline to enjoin the imposition of the tax pending further proceedings in the trial court.

¶2 Additionally, we hold that Prop. 208 does not violate article 9, section 22 of the Arizona Constitution ("Tax Enactment Clause"), because that clause does not apply to voter initiatives. Therefore, the bicameralism, presentment, and supermajority requirements found therein are inapplicable to Prop. 208.

## I. BACKGROUND

¶3 On February 14, 2020, Invest in Education[1] filed an initiative application with the Secretary of State. That initiative, titled the "Invest in Education Act," was placed on the ballot as Prop. 208, and asked voters to approve a statutory measure implementing a new income tax surcharge to fund additional spending on education. A.R.S. § 43-1013. Prop. 208 has three central provisions: (1) a taxing provision ("Taxing Provision"), (2) a provision allocating revenues to various funds for various educational purposes ("Allocating Provision"), and (3) a provision exempting itself from the constitutional definition of local revenues ("Local Revenues Provision").

¶4 The Taxing Provision imposes a 3.5% income tax surcharge on "taxable income in excess of $250,000" for anyone filing separately or on "taxable income in excess of $500,000" for married couples. § 43-1013(A). Prop. 208 requires the Arizona Department of Revenue ("ADOR") to "separately account for revenues collected pursuant to [this] income tax surcharge" and to "deposit those revenues" into the newly established "student support and safety fund." § 43-1013(B). This requirement is codified at A.R.S. § 15-1281.

---

[1] On August 3, 2021, the Court granted Invest in Education's motion to change the caption of this case to reflect its new name of Invest in Arizona. Because Invest in Education was the name of the organization at all times relevant hereto, we use the original name in the opinion.

¶5          The Allocation Provision details how state officials must distribute this revenue.  § 15-1281(B), (D).  First, the costs of administration are paid from the account.  § 15-1281(B).  Next, Prop. 208 creates a "student support and safety fund" ("Fund") and mandates that the Fund distribute nearly all the remaining revenue to school districts and charter schools through "grants." § 15-1281(D).  The allocations are as follows:

- 50% "as grants" for "hiring teachers and classroom support personnel and increasing [their] base compensation," § 15-1281(D)(1);

- 25% "as grants" for "hiring student support services personnel and increasing [their] base compensation," § 15-1281(D)(2);

- 10% "as grants" for "providing mentoring and retention programming for new classroom teachers to increase retention," § 15-1281(D)(3);

- 12% to "to the career training and workforce fund established by [A.R.S.] § 15-1282," § 15-1281(D)(4); which become "multi-year grants . . . to school districts, charter schools and career technical education districts," § 15-1283(A)(1); and

- 3% to the "Arizona teachers academy fund," § 15-1281(D)(5).

¶6          In the Local Revenues Provision, Prop. 208 states that "monies received by school districts and career technical education districts pursuant to this chapter . . . [a]re not considered local revenues for the purposes of" the Education Expenditure Clause and "[a]re exempt from any budgetary, expenditure or revenue control limit that would limit the ability of school districts or career technical education districts to accept or expend those monies." § 15-1285.

¶7          Before the initiative was certified for the ballot, Invest in Education requested a review of their initiative language from Arizona's Legislative Council, who opined that the provision defining Prop. 208 money as grants and not local revenues was "likely invalid" because it conflicted with the Education Expenditure Clause.  Despite receiving this legislative feedback before the initiative was certified for the ballot, Invest

in Education declined to modify the text of its initiative or to pursue an initiative to amend the constitution.

¶8          Subsequently, an action to enjoin Prop. 208's placement on the ballot was filed, challenging the sufficiency of its 100-word description under § 19-102(A). *Molera v. Hobbs*, 250 Ariz. 13, 18 ¶ 3 (2020). The challengers also claimed that the initiative lacked sufficient valid signatures, alleging that many of the signatures should be disqualified because they were gathered by petition circulators who were paid in violation of § 19-118.01(A). *Id.* After a trial, the superior court enjoined Prop. 208's placement on the ballot. *Id.* ¶ 4. Affirming in part and reversing in part, we ordered Prop. 208's placement on the ballot. *Id.* at 27 ¶ 54.

¶9          Voters approved Prop. 208 with a 51.7% majority vote. On November 30, 2020, the vote was certified, and the law became effective on January 1, 2021. The same day of the vote certification, Appellants Karen Fann, Russell Bowers, David Gowan, Venden Leach, Regina Cobb, John Kavanagh, Monte Lee, Steven Pierce, Francis Surdakowski, "No on 208," and the Arizona Free Enterprise Club (collectively, "Fann") sued to enjoin Prop. 208 and requested a preliminary injunction pending trial. On December 3, 2020, Invest in Education was granted leave to intervene.

¶10          After briefing and oral argument, the superior court denied the Motion for Preliminary Injunction. Fann appealed, asking the court of appeals to reverse the superior court's denial of a preliminary injunction and declare Prop. 208 unconstitutional. We subsequently granted Fann's petition to transfer the case to this Court. On appeal, Fann presents two issues. First, does Prop. 208's Local Revenues Provision violate the Education Expenditure Clause by purporting to exempt Prop. 208 monies from the expenditure limitation contained in the Arizona constitution? Second, can Prop. 208 impose a new tax without a supermajority vote of both houses of the legislature, as required by the Arizona constitution's Tax Enactment Clause?

## II.  DISCUSSION

### Ripeness

¶11          Initially, Invest in Education asserts that the challenges to Prop. 208 are not ripe for decision, arguing no Prop. 208 tax revenues have

been allocated or spent. "The ripeness doctrine prevents a court from rendering a premature judgment or opinion on a situation that may never occur." *Winkle v. City of Tucson*, 190 Ariz. 413, 415 (1997). Whether to apply the ripeness doctrine in Arizona is a matter of "prudential or judicial restraint." *City of Surprise v. Ariz. Corp. Comm'n*, 246 Ariz. 206, 209 ¶ 8 (2019) (quoting *Dobson v. State ex rel., Comm'n on App. Ct. Appointments*, 233 Ariz. 119, 122 ¶ 9 (2013)). Our courts exercise restraint to ensure they "refrain from issuing advisory opinions, that cases be ripe for decision and not moot, and that issues be fully developed between true adversaries." *Bennett v. Brownlow*, 211 Ariz. 193, 196 ¶ 16 (2005).

**¶12** Though federal justiciability jurisprudence is not binding on Arizona courts, we find the factors federal courts use to determine whether a case is justiciable instructive. *Brush & Nib Studio, LC v. City of Phoenix*, 247 Ariz. 269, 280 ¶ 36 (2019). "[I]f the plaintiff has incurred an injury, the case is ripe." *Id.* "A case is also ripe if there is an actual controversy between the parties." *Id.* And, "[w]here a statute clearly and immediately affects the property rights of the citizen, he [or she] has an immediate and present controversy with reference to the validity of such a statute." *Planned Parenthood Ctr. of Tucson, Inc. v. Marks*, 17 Ariz. App. 308, 312 (1972) (citation omitted).

**¶13** Invest in Education argues that because school districts have not yet received or spent money generated from Prop. 208, the case "rests upon contingent future events that may not occur as anticipated" and that the case is not ripe for decision until revenues are allocated in excess of the expenditure limit and the legislature refuses to authorize the excess expenditures. While it is true that the factual record is not sufficiently developed to determine definitively whether spending Prop. 208 revenues will run afoul of the Education Expenditure Clause, Invest in Education's argument ignores the fact that Fann challenges the constitutionality of Prop. 208 in its entirety, both facially and as-applied.

**¶14** As of Prop. 208's effective date, the statute began clearly and immediately affecting the petitioners' property rights as they became subject to the tax and so a present controversy regarding the validity of the statute exists. The case is ripe for decision. *See Winkle*, 190 Ariz. at 415, 418; *Planned Parenthood*, 17 Ariz. App. at 312.

**Standards of Review**

¶15        We review the denial of a preliminary injunction for an abuse of discretion. *Clay v. Arizona Interscholastic Ass'n, Inc.*, 161 Ariz. 474, 476 (1989). An abuse of discretion exists where the trial court "clearly erred in finding the facts or applying them to the legal criteria for granting an injunction," *Shoen v. Shoen*, 167 Ariz. 58, 62 (App. 1990), or "if the [trial] court applied the incorrect substantive law," *TP Racing, L.L.L.P. v. Simms*, 232 Ariz. 489, 492 ¶ 8 (App. 2013).

¶16        A party seeking a preliminary injunction must show (1) a strong likelihood of success on the merits, (2) the possibility of irreparable harm if the relief is not granted, (3) the balance of hardships favors the party seeking injunctive relief, and (4) public policy favors granting the injunctive relief. *Smith v. Ariz. Citizens Clean Elections Comm'n*, 212 Ariz. 407, 410 ¶ 10 (2006). To meet this burden, "the moving party may establish either 1) probable success on the merits and the possibility of irreparable injury; or 2) the presence of serious questions and [that] the balance of hardships tip[s] sharply in favor of the moving party." *Id.* (quoting *Shoen*, 167 Ariz. at 63) (cleaned up). This is a sliding scale, not a strict balancing of factors. *Id.* "The greater and less reparable the harm, the less the showing of a strong likelihood of success on the merits need be. Conversely, if the likelihood of success on the merits is weak, the showing of irreparable harm must be stronger." *Id.*

¶17        We therefore turn to the merits of Fann's claims. We review legal and constitutional questions de novo. *State v. Harrod*, 218 Ariz. 268, 279 ¶ 38 (2008).

**A.  Article 9, Section 21—The Education Expenditure Clause**

**Unconstitutionality**

¶18        Fann argues that the Local Revenues Provision of Prop. 208 is facially unconstitutional because the mandatory direct funding to school districts violates the Education Expenditure Clause. A facial challenge to the constitutionality of a statute requires a showing that no set of circumstances exists under which the statute would be valid. *State v. Wein*, 244 Ariz. 22, 31 ¶ 34 (2018). We begin with the enactment of the Education Expenditure Clause.

*Education Expenditure Clause*

¶19        In 1980, the Arizona Legislature referred to voters several propositions to curb the increasing taxes assessed on Arizonans. Describing these propositions, the Legislative Council wrote:

> School districts levy more property taxes than any other taxing jurisdiction in this state . . . . School district and community college spending must be limited to control spending at the local level. This proposition would terminate local government's blank check drawn on people's earnings. . . . Under our present system there is very little incentive for school district and community college district governing boards to limit the amount of monies they levy by way of the property tax.  There is tremendous and continuous pressure on the governing boards . . . to increase the burden on the taxpayers of this state in order to fund new programs, expand existing programs or increase salaries.  Lack of adequate limitation on total spending by school districts . . . is responsible for the ever-increasing local tax burden.

Legis. Analyst, analysis of Prop. 109 (1980 Special Sess.) p.76.

¶20        In June of that year, Arizona voters amended the constitution to, among other things, limit the amount of tax expenditures by school districts.  The resulting Education Expenditure Clause established an Economic Estimates Commission ("EEC"), which sets an "aggregate expenditure limitation" for each Arizona school district, i.e., a budget cap established by reference to a 1979 benchmark.  Expenditures of revenue received by school districts from tax disbursements by the state and from local or county taxes are subject to this cap.  Districts may only spend "local revenues" so long as their aggregate spending does not exceed this commission-set cap, unless separately authorized by the legislature.  Ariz. Const. art. 9, § 21(2).  Local revenues are defined as:

> [A]ll monies, revenues, funds, property and receipts of any kind whatsoever received by or for the account of a school district or community college district or any of its agencies, departments, offices, boards, commissions, authorities, councils and institutions . . . .

Ariz. Const. art. 9, § 21(4)(c).

*The Education Expenditure Clause's Grant Exception*

**¶21**        There is no dispute that the sweeping definition of local revenues includes Prop. 208's direct funding to school districts. However, Invest in Education argues that Prop. 208 money is a "grant," which the Education Expenditure Clause exempts from the definition of local revenues:

> Any amounts or property received as *grants*, gifts, aid or contributions of any type except amounts received directly or indirectly in lieu of taxes received directly or indirectly from any private agency or organization, or any individual.

Ariz. Const. art. 9, § 21(4)(c)(v) ("Grant Exception") (emphasis added).

**¶22**        We, therefore, must determine whether direct funding to schools under Prop. 208 is a grant pursuant to the Grant Exception, a question of constitutional and statutory interpretation.

**¶23**        Laws enacted by initiative, like acts of the legislature, are presumed constitutional. *Ruiz v. Hull*, 191 Ariz. 441, 448 ¶ 25 (1998). And where there is a reasonable, even though debatable, basis for the statute, we will uphold it unless it is clearly unconstitutional. *State v. Arevalo*, 249 Ariz. 370, 373 ¶ 9 (2020). But, while "[t]he presumption of constitutionality may require us to interpret a statute to give it a constitutional construction if possible, . . . we will not rewrite a statute to save it." *Id.*

**¶24**        Through its Local Revenues Provision, Prop. 208 attempts to characterize the nature of the direct payments as grants to circumvent the Education Expenditure Clause's requirement that spending not exceed the expenditure limit. The provision states that the funds Prop. 208 generates "[a]re not considered local revenues" under the Arizona Constitution and "[a]re exempt from any . . . expenditure . . . limit." A.R.S. § 15-1285(1), (2). But a statute cannot circumvent or modify constitutional requirements, and language chosen by a statute's proponents will not bind nor limit the Court's determination of its meaning. *Fragoso v. Fell*, 210 Ariz. 427, 431 ¶ 13 (App. 2005). The legislature, or in the case of an initiative, the people, usurp

10

the function of the judiciary when they declare a law's meaning. *State v. Prentiss*, 163 Ariz. 81, 85 (1989). Pursuant to separation of powers, it is the judiciary's exclusive power to state what the law is. *Forty-Seventh Legislature v. Napolitano*, 213 Ariz. 482, 485 ¶ 8 (2006). Consequently, while it is a guide to the drafters' intent, we give Prop. 208's constitutional self-exemption language no weight in interpreting whether such funds are grants or local revenues.

¶25 In interpreting constitutional and statutory provisions, we give words "their ordinary meaning unless it appears from the context or otherwise that a different meaning is intended." *Arizona ex rel. Brnovich v. Maricopa Cnty. Cmty. Coll. Dist. Bd.*, 243 Ariz. 539, 541 ¶ 7 (2018) (quoting *State v. Miller*, 100 Ariz. 288, 296 (1966)). Accordingly, "[w]e interpret statutory language in view of the entire text, [and] consider[] the context." *Nicaise v. Sundaram*, 245 Ariz. 566, 568 ¶ 11 (2019); *see also Adams v. Comm'n on App. Ct. Appointments*, 227 Ariz. 128, 135 ¶ 34 (2011) ("[I]t is a 'fundamental principle of statutory construction (and, indeed, of language itself) that the meaning of a word cannot be determined in isolation, but must be drawn from the context in which it is used.'" (quoting *Deal v. United States*, 508 U.S. 129, 132 (1993))). We also avoid interpreting a statute in a way that renders portions superfluous. *See City of Phoenix v. Yates*, 69 Ariz. 68, 72 (1949) ("Each word, phrase, and sentence must be given meaning so that no part will be [void], inert, redundant, or trivial.").

¶26 The parties argue that the ordinary meaning of the term "grant" supports their position, but they disagree substantially on that meaning. Each party marshals a supportive dictionary definition. Invest in Education defines "grant" as "an amount of money given especially by the government to a person or organization for a special purpose,"[2] or "an amount of money that a government or other institution gives to an individual or to an organization for a particular purpose such as education

---

[2] *Grant*, Cambridge Dictionary, https://dictionary.cambridge.org/us/dictionary/english/grant (last visited July 27, 2021).

or home improvements."[3]  Fann defines "grant" as "something granted; esp: a gift (as of land or a sum of money) usu. for a particular purpose."[4] Fann argues that, based on her cited definition, a "grant entails a discretionary transfer that is not required by law" and "does not refer to mandatory taxation and spending."

¶27        We interpret the meaning of "grant" in context.  But as the parties assert, the meaning of the Grant Exception is subject to two competing interpretations based on whether the clause "received directly or indirectly from any private agency or organization, or any individual" modifies the clause "[a]ny amounts or property received as grants, gifts, aid or contributions of any type" or instead modifies only the words "except amounts received directly or indirectly in lieu of taxes."[5]  The former would limit grants to anything given by non-public entities; the latter provides that grants in lieu of taxes can be made by non-public entities. Because there are two plausible interpretations of the term "grant" as used in the Grant Exception, we consider secondary means of interpretation.  *See, e.g.*, *State v. Jurden*, 239 Ariz. 526, 547 ¶ 15 (2016) (stating that if "the statute is subject to more than one reasonable interpretation, we consider secondary principles of statutory interpretation").

¶28        Under Invest in Education's interpretation of the Education Expenditure Clause, several constitutional provisions preceding and following the Grant Exception are rendered superfluous. Article 9, section 21(4)(c)(iv) excepts from local revenues "grants and aid of any type

---

[3] *Grant*, Collins Dictionary, https://www.collinsdictionary.com/us/dictionary/english/grant (last visited July 27, 2021).

[4] *Grant*, Webster's Third New International Dictionary (unabridged 1981).

[5] The trial court suggested that construing art. 9, § 21 as limited to private grants would require additional commas in the text.  But lack of commas is not dispositive, nor is it surprising.  For instance, the 1980 Arizona Legislative Bill Drafting Manual, which was the edition in place when the constitutional language was proposed, advised legislators to "[u]se commas sparingly."  *See* ACA-APP5, Arizona Legislative Bill Drafting Manual (Jan. 1980) at 45, https://azmemory.azlibrary.gov/digital /collection/statepubs/id/38016.

received from the federal government," and article 9, section 21(4)(c)(vi) exempts "amounts received from the state for the purpose of purchasing land, buildings or improvements or constructing buildings or improvements." If the Grant Exception was meant to encompass private *and* public grants, these exemptions would be unnecessary. Again, we do not interpret the constitution so as to render portions of it superfluous. *State v. Deddens*, 112 Ariz. 425, 429 (1975).

¶29 Likewise, applying the *noscitur a sociis* canon—the principle that the meaning of an unclear word or phrase should be determined by the words immediately surrounding it—we note that the word "grants" appears alongside other words indicating voluntary contributions in the Grant Exception: "gifts," "aid," and "contributions." This suggests that the word "grant" is meant to reflect donative intent and does not encompass Prop. 208's compulsory transfer of tax revenue from the State to school districts. *See Yates v. United States*, 574 U.S. 528, 543–44 (2015) (applying *noscitur a sociis* canon).

¶30 Considering the context of the Grant Exception, and in light of canons of construction, we conclude the more plausible reading of the Grant Exception is that the language "received directly or indirectly from any private agency or organization, or any individual" modifies the entire sentence and limits the word "grants" to private, non-governmental voluntary contributions.

¶31 We hold that Prop. 208 revenues are not grants within the meaning of the Grant Exception and thus are local revenues. Because A.R.S. § 15-1285 incorrectly characterizes the allocated monies in order to exempt Prop. 208 from the Education Expenditure Clause, it is facially unconstitutional. As a consequence, A.R.S. § 15-1281(D) is also unconstitutional to the extent allocated revenues exceed the expenditure limit set by the Education Expenditure Clause.

## Severability

¶32 Having determined § 15-1281(D) to be unconstitutional if it allocates revenues in violation of the Education Expenditure Clause, we turn to whether A.R.S. § 15-1281(D)(1), (2), and (3) are severable from the remainder of Prop. 208. In *Randolph v. Groscost*, we established a severability test for voter initiatives. 195 Ariz. 423, 427 ¶ 15 (1999). Initially,

Fann argues that the Voter Protection Act ("VPA"), Ariz. const. art 4, pt. 1, §1(6), necessitates that we abandon the *Randolph* test and categorically bar severance of provisions in voter initiatives.

**¶33** Fann quotes *Randolph* in support of her position, arguing that "hypothesizing as to which provisions would have been sufficiently important to a majority of the electorate is 'nearly impossible.'" *Randolph*, 195 Ariz. at 427 ¶ 15. She also cites *Molera v. Reagan* (*Molera I*) for the proposition that "with the enactment through initiative of the VPA, legislation enacted by the voters is even more consequential, such that the legislature cannot repeal an initiative-enacted law." 245 Ariz. 291, 294 ¶ 9 (2018). Fann calls on this Court to "combine the insights from *Randolph* and *Molera I* and decline to sever where a post-VPA initiative is involved." We decline to do so.

**¶34** Fann's premise would require courts to strike initiatives if any part is flawed, no matter how inconsequential. It is true that in *Randolph* this Court acknowledged that applying the severability test designed for traditional legislation was "nearly impossible." *Randolph*, 195 Ariz. at 427 ¶ 15. But that is why this Court, in the same paragraph, developed a special severability test for initiatives. *Id.* (severing an invalid initiative provision); *see also Citizens Clean Elections Comm'n v. Myers*, 196 Ariz. 516, 522 ¶ 23 (2000) (applying the test to sever an invalid initiative provision). Additionally, although Fann argues the VPA changed the severability landscape when passed in 1998, this Court created its severability test post-VPA in *Randolph* (1999) and subsequently applied it in *Myers* (2000).

**¶35** *Molera I* stands for the proposition that "the courts must not intrude upon the people's power to legislate . . . . This Court has observed that the citizens' legislative authority is as great as the power of the Legislature to legislate." 245 Ariz. at 294 ¶ 9 (internal quotation marks omitted) (quoting *State ex rel. Bullard v. Osborn*, 16 Ariz. 247, 250 (1914)). Precluding severance of laws enacted by initiative while allowing severance to save laws enacted by the legislature would improperly limit the people's power to legislate. Thus, we affirm that *Randolph*'s test remains correct for determining the severability of unconstitutional provisions contained within voter initiatives. *See Myers*, 196 Ariz. at 522–23 ¶¶ 23–25 (applying *Randolph*'s severance test to a voter initiative after the enactment of the VPA).

**¶36** Pursuant to *Randolph*, an unconstitutional provision in a voter initiative may be severed if "the valid portion, considered separately, can operate independently and is enforceable and workable." *Randolph*, 195 Ariz. at 427 ¶ 15. If the initiative is workable, "we will uphold it unless doing so would produce a result so irrational or absurd as to compel the conclusion that an informed electorate would not have adopted one portion without the other." *Id.* Accordingly, we ask whether Prop. 208—without the Local Revenues Provision—is workable and, if so, whether rational voters would have adopted Prop. 208 in its severed form.

**¶37** Fann contends that workability refers "to the law's ability to accomplish its stated purpose without remedial action." This framing is as concise as it is correct. In *Randolph*, we rejected discerning voter intent regarding adoption of the non-severed statute. *Id.* Rather, when considering the severability of legislative acts, we have concluded that the unoffending part of a statute will be upheld "where the valid and invalid parts are so separate and distinct that it is clear" that the valid portion will stand on its own. *Millett v. Frohmiller*, 66 Ariz. 339, 342–43 (1948) (citation omitted). On the other hand, "where the constitutional and unconstitutional provisions are so connected and interdependent in subject matter, meaning, and purpose," the entire proposition will be invalid. *Id.* at 343; *see also McComish v. Brewer*, No. CV-08-1550-PHX-ROS, 2010 WL 2292213, at *11 (D. Ariz. Jan. 20, 2010) ("Inherent in [*Randolph's* workability] test is the requirement that severance can occur only when the remaining portion is workable *without further action* by the State."), *rev'd on other grounds by McComish v. Bennett*, 611 F.3d 510 (9th Cir. 2010); *State Comp. Fund v. Symington*, 174 Ariz. 188, 195 (1993) ("[T]he problem is twofold: the legislature must have intended that the act be separable, and the act must be capable of separation in fact." (quoting 2 Sutherland, *Statutory Construction* § 44.03 (4th ed. 1986))); *McCune v. City of Phoenix*, 83 Ariz. 98, 106 (1957) ("Generally, we have said that if the valid parts are independently effective and enforceable as law . . . the court will not disturb the constitutional portion of the act."); *Frohmiller*, 66 Ariz. at 343 ("To be capable of separate enforcement, the valid portion of an enactment must be independent of the invalid portion and must form a complete act within itself." (quoting 2 Sutherland, *Statutory Construction* § 2404 (3rd ed. 1943))).

**¶38** In *Citizens Clean Elections Commission v. Myers*, this Court considered whether it could sever a portion of an act dealing with the

15

Citizens Clean Elections Commission ("CCEC"). 196 Ariz. at 522 ¶ 23. In *Myers*, the offending portion of the act required the Commission on Appellate Court Appointments to nominate candidates for the CCEC, which we found provided the Commission with "functions wholly alien to its constitutional charter" and thus in violation of our constitution. *Id.* ¶ 22. We then analyzed whether the remainder of the Act could function without the offending provision. We found that after severing the offending provision, the statewide officers could still make appointments of judges. *Id.* ¶ 24. Thus, we concluded that "the valid portions of the Act considered separately can operate independently and are workable" as it presently existed. *Id.*

**¶39** That is not the case for Prop. 208. Here, severance of the unconstitutional provisions strikes A.R.S. § 15-1281(D)(1), (2), and (3) from the statute. This leaves Prop. 208 with no statutory authority to spend approximately 85% of the funds raised by the tax and placed in the Student Support and Safety Fund ("Fund"). Fund monies remain perennially sequestered—they may not be transferred to any other fund, do not revert to the state general fund, and do not lapse. A.R.S. § 15-1281(A). The Joint Legislative Budget Committee projects that Prop. 208 will generate "$827 million in revenue . . . in the first full year of implementation," and Prop. 208's ballot materials included this projection as an inducement for enacting its new tax.[6] Thus, unlike in *Myers*, severing the allocation provisions in A.R.S. § 15-1281(D)(1), (2), and (3) materially impacts the initiative's operation such that the remainder of Prop. 208 cannot stand on its own.

**¶40** Applying the first prong of the *Randolph* test, under the remaining statutory provisions of Prop. 208, hundreds of millions of tax dollars will be sequestered in a designated state fund, unable to be spent, to the extent they exceed the expenditure limit. This result makes the remaining portion of Prop. 208 unworkable and thus not severable from its unconstitutional provisions.

**¶41** Under *Randolph*'s second prong, Prop. 208 likewise does not survive because the result of the residual provisions is irrational or absurd. A statutory provision resulting in tax revenues being impounded with no

---

[6] *Arizona's General Election Guide*, "Proposition 208, Joint Legislative Budget Committee Fiscal Analysis," 136.

prospect of being spent or refunded is such a result. The stated purpose of Prop. 208 was to tax high income individuals to raise revenue that would be directly provided to school districts based on "years of underfunding by the Legislature." Given that the tax increase was not itself the measure's objective, but rather how its objectives would be achieved, leaving the Taxing Provision in place without the Allocation Provision is simply not rational. Collecting taxes that cannot be spent does little or nothing to provide increased support for school districts. Indeed, that eventuality would be "so irrational or absurd as to compel the conclusion that an informed electorate would not have adopted" the taxing provision without the provision requiring that the money be allocated to schools. *Randolph*, 195 Ariz. at 427 ¶ 15; *see also Ruiz*, 191 Ariz. at 459 ¶ 67 ("A statute or provision is severable . . . if the invalid portion was not the *inducement for the passage of the entire act*." (emphasis added) (quoting *Campana v. Ariz. State Land Dep't*, 176 Ariz. 288, 294 (App. 1993))).

¶42 The Court in its entirety agrees that Prop. 208 cannot constitutionally authorize spending in violation of the Education Expenditure Clause. The dissent argues, however, that we cannot consider severability on the basis of an as-applied constitutional challenge and that "[t]his paradigm eliminates the distinction between as-applied and facial challenges that our courts have regularly recognized," asserting that "[d]eciding whether to sever a statutory provision only comes into play if the provision is facially unconstitutional and thus void in all applications. If the provision is unconstitutional as applied under particular circumstances, that application is severed from the statute, but the provision itself otherwise remains part of the statute and operable." *Infra* at ¶¶ 75, 69 (internal citation and emphasis omitted).

¶43 To the contrary, while A.R.S. § 15-1281(D)(1), (2), and (3), and § 15-1285(2) for that matter, might be operable in other circumstances, they are unconstitutional to the extent the expenditures thereunder exceed the Education Expenditure Clause. *Infra* at ¶ 71. That unconstitutionality is what requires us to analyze severability, even in an as-applied challenge. *See, e.g.*, *Empress Adult Video & Bookstore v. City of Tucson*, 204 Ariz. 50, 65 ¶ 41 (App. 2002) (applying severability analysis to an unconstitutional statute as applied), *disapproved on other grounds*, *State v. Stummer*, 219 Ariz. 137, 144 ¶ 22 & n.6 (2008); *State v. Snyder*, 25 Ariz. App. 406, 408–09 (1976) (same). The partial dissent urges that even though the Act may be unconstitutional in some years, it could be constitutional in others, allowing

it to lurch along even though it contains no provision to account for hundreds of millions of dollars in unspent revenues in years in which it is not operational. With respect, once the measure requires expenditures that we all agree would be unconstitutional, it renders the entire Act incoherent and unworkable and thus unseverable.

¶44 The partial dissent cites no authority for her argument that a severability analysis applies only to a facial challenge. Instead, the dissent cites three cases in which the court decided that statutory provisions in question were unconstitutional as applied and in which, as the dissent acknowledges, severability was not considered. *See infra* ¶ 79. The dissent concludes from those cases that a severability analysis does not pertain to an as-applied challenge and that in so doing, we have created a "new analytical paradigm." Not so. Unlike the cases cited by the dissent, here the question of severance was raised and briefed by the parties. Fann was successful, at least partially, on her facial challenge and we address the potential as-applied unconstitutionality and the question of severance to guide the trial court on remand.

¶45 Invest in Education and the dissent argue that Prop. 208 is nonetheless both rational and workable because an existing legislative process controls how any expenditures in excess of the budget limitation would be handled. Article 9, section 21(3) of the Arizona Constitution provides:

> Expenditures in excess of the limitation determined pursuant to subsection (2) of this section may be authorized by the legislature for a single fiscal year, by concurrent resolution, upon affirmative vote of two-thirds of the membership of each house of the legislature.

¶46 Similarly, A.R.S. § 15-911(E) requires that if the expenditure of local revenues exceeds the expenditure limitation, each school district is required to reduce its expenditures to meet the limitation. However, the legislature, "on approval of two-thirds of the membership of each house of the legislature, may authorize the expenditures of local revenues in excess of the expenditure limitation for the current fiscal year." A.R.S. § 15-911(C)(2).

¶47        But this does not aid Prop. 208 in determining severability. First, such a process was nowhere contemplated as the mechanism for allocating the Fund.  This statutory process is not mentioned in Prop. 208, nor is it mentioned in § 15-1281 (the Allocation Provision); it is not mentioned as an alternative to § 15-1285 (the Grant Exception); nor was it mentioned in any other part of the ballot materials distributed to the voters in anticipation of the election.  It is untenable, then, to assert that Prop. 208 was drafted intending that § 15-911 could supplant the unconstitutional spending provision when no such contingency was presented to the electorate.  *See Randolph*, 195 Ariz. at 427 ¶ 15 (holding that the valid portion of the statute will be upheld only if an informed electorate would have adopted one portion without the other).

¶48        To be sure, on at least two occasions, the legislature has authorized expenditures in excess of the budget limitation, in 2001–02 and 2007–08.  Even so, although the legislature may have been willing to authorize excess expenditures on occasion, there are far more instances where the legislature has *declined* to authorize excesses.  In the past four years alone, at least five attempts to grant a budget override have failed to pass.  *See, e.g.*, H.C.R. 2043, 54th Leg., 2nd Reg. Sess. (Ariz. 2020); S.C.R. 1035, 54th Leg., 2nd Reg. Sess. (Ariz. 2020); H.B. 2304, 54th Leg., 1st Reg. Sess. (Ariz. 2019); H.B. 2171, 53rd Leg., 2nd Reg. Sess. (Ariz. 2018); H.B. 2480, 53rd Leg., 1st Reg. Sess., (Ariz. 2017 ).

¶49        More importantly, Invest in Education advertised Prop. 208 to the voters as "[a]dditional permanent funding" for schools.  *See Arizona's General Election Guide, "Proposition 208, Joint Legislative Budget Committee Fiscal Analysis,"* at 127.  But if Prop. 208 were to function only at the whim of an annual legislative override, the initiative can hardly be considered "permanent" funding.[7]  Thus, Invest in Education's assertion that

---

[7] Context gleaned from neighboring provisions confirms this. Article 9, § 21 includes two expenditure limitations—one at issue here, applicable to school districts, and a second applicable to community college districts. *Compare* Ariz. Const. art. 9, § 21(2) (school districts) *with id.* § 21(1) (community colleges).  The community college district expenditure limitation allows for the creation of statutory exceptions, while the school district expenditure limitation does not.  Specifically, § 21(1), applicable to

legislative authorization—by a supermajority vote of both houses—makes the remainder of Prop. 208 workable and thus severable is unpersuasive. Finally, we find it unlikely to the point of absurdity that an electorate who voted for an initiative to spend money directly on schools because the legislature had declined to do so, would have voted for an initiative that required annual legislative action for the money to be spent.

¶**50**        Indeed, in every severability case it is true that the legislature *could* pass legislation in the future to remedy an otherwise unconstitutional initiative provision.  Thus, we would always find severability if we analyzed severance in light of what *could* happen in the future or what the legislature *could* do to make an otherwise unworkable provision workable. For instance, even without article 9, section 21(3), under the VPA, each house of the legislature by a two-thirds vote could modify Prop. 208, if done in furtherance of the initiative.  The legislature could refer to the voters an initiative to amend the constitution to expand or remove the expenditure limit entirely.  Or, as Invest in Education argued in this case, a subsequent legislature might be elected that is more inclined to vote to waive the expenditure limit in a given year.  Any of the foregoing might provide a mechanism for spending the money in the Fund.  But none is certain to do so nor guaranteed to prevent millions of taxpayer dollars from being raised yet going unspent.  Thus, in determining workability or rationality, we do not consider the salutary effect of subsequent legislative action.  Instead, we analyze the legal landscape as it exists, not as the legislature might see fit to change it in the future.  *See Prentis v. Atl. Coast Line Co.*, 211 U.S. 210, 226 (1908).

---

community colleges, allows for exceptions to the expenditure limitation as "provided by law."  Section 21(2), governing school districts contains no such allowance, providing for only a one-time legislative authorization requiring a two-thirds vote of each house of the legislature.  In Arizona, when the constitution authorizes taking an action "by law," it refers to statutory law.  *Shute v. Frohmiller*, 53 Ariz. 483, 488 (1939), *overruled on other grounds by Hudson v. Kelly*, 76 Ariz. 255 (1953).  Had the drafters of § 21(1) intended to allow the expenditure limit to be modified by statute it is likely they would have added similar language to article 9, section 21(2).

*Severability Clause*

**¶51** Prop. 208's severability clause also does not alter our conclusion about the purpose of Prop. 208 or whether particular provisions are, in fact, severable. *See Myers*, 196 Ariz. at 523 ¶ 25 (when there exists an express severability clause, "all doubts are to be resolved in favor of severability"); *Norton v. Superior Court*, 171 Ariz. 155, 158 (App. 1992) ("A severability clause is merely useful, not essential, evidence of legislative intent."). Prop. 208 provides, in relevant part, that "[i]f any provision of this act . . . is declared invalid . . . such invalidity does not affect other provisions or applications of this act that can be given effect without the invalid provision or application." As discussed above, without the offending provision, Prop. 208's remaining portions cannot be given effect to the extent they exceed the expenditure limitation. The severability clause further provides that the invalidated provision "shall be deemed reformed to the extent necessary to conform to applicable law and to give the maximum effect to the intent of this act." However, the act intended to drastically increase education spending, which cannot be done without the invalid provision. Consequently, the severability clause does not save Prop. 208. *See Hudson v. Kelly*, 76 Ariz. 255, 274 (1953) ("The severability clause contained in the Act is of no avail where the valid and invalid parts of a statute are inextricably entwined and so connected and interdependent in subject matter, meaning and purpose as to preclude the presumption that the legislature would have passed the one without the other, but, on the contrary, justify the conclusion that the legislature intended them as a whole and would not have enacted a part only."); *Norton*, 171 Ariz. at 158.

*Remand for Determination of Expenditure Limit Amount*

**¶52** To the extent they exceed the constitutional expenditure limitations, Prop. 208's direct payments to school districts under A.R.S. § 15-1281(D)(1), (2), and (3) are unconstitutional, and these provisions are not severable from the remainder of Prop. 208. However, the record before this Court is insufficient to establish whether such payments will in fact exceed the constitutional expenditure limitation.

**¶53** In a letter to certain legislator-plaintiffs, Superintendent of Public Instruction Hoffman explained that current "aggregate expenditures of local monies for all school districts is $6,165,430,899 for fiscal year 2020–21," but the "aggregate expenditure limitation for all school districts [is]

21

$6,309,587,438," leaving just a $144,156,539 gap between school expenditures and their expenditure limit. Thus, if the expenditure limit remains at current levels, Prop. 208's projected $827 million in revenues will far outpace its permissible spending, even accounting for Prop. 208 expenditures that are not subject to the expenditure limit.[8] Furthermore, the EEC projects that the expenditure limit amount will decrease by 4.6%, or approximately $300,000,000. *See* EEC, Feb. 24, 2021 Letter to Governor Ducey, https://azdor.gov/sites/default/files/media/REPORTS _ESTIMATES _2022_SchoolDist-Feb21.pdf. These facts strongly suggest that Prop. 208 will produce far more revenue than it can constitutionally spend. Invest in Education takes a contrary position.

**¶54** In any event, there is no record before the Court upon which we can make such a determination. Citing a lack of "expertise on school finance," and the need for an evidentiary hearing, the trial court had no opportunity to determine whether Prop. 208 funds might exceed the expenditure limit. Based on the limited record before us, it appears that Prop. 208 funds *could* likely exceed the constitutional spending limitation placed on school districts. However, we cannot with certainty decide whether Prop. 208 revenues *will* exceed the expenditure limit. Therefore, we remand to the trial court for a determination of this issue. If the trial court finds that the tax revenues allocated will not exceed the expenditure limit, then there is no present constitutional violation and Prop. 208 stands. However, if the trial court finds that A.R.S. § 15-1281(D) will result in the accumulation of money that cannot be spent without violating the expenditure limit, it must declare Prop. 208 unconstitutional and enjoin its operation. Moreover, to further clarify this inquiry for the trial court, if any

---

[8] Twelve percent of Prop. 208 monies qualify for the Grant Exception and roughly 17% goes to charter schools. *See* § 15-1281(D)(1)–(5) (listing the percentage allocation of Prop. 208 revenue, and allowing charter schools to participate in 85% of Prop. 208 spending according to the weighted student population in A.R.S. § 15-943); Arizona Department of Education, Accountability & Research Data, available at https://www.azed.gov /accountability-research/data (calculating charter school's enrollment to be approximately 20%). Thus, a little over 29% of Prop. 208 monies are not local revenues, leaving roughly 70% that are local revenues. If Prop. 208 generates the $827 million that JLBC projects, this would leave roughly $600 million in local revenues subject to the expenditure limit.

material amount of the Prop. 208 revenue is sequestered in a designated state fund because it cannot be spent due to the expenditure limit, then Prop. 208, in its entirety, is unconstitutional. *See Material*, Black's Law Dictionary (11th ed. 2019) (defining "material" as "[o]f such a nature that knowledge of the item would affect a person's decision-making; significant; essential").

## B. Article 9, Section 22—The Tax Enactment Clause

¶55 The people's right to pass laws and constitutional amendments is found in article 4, part 1, section 1 of the Arizona Constitution. The people may, through the initiative process, place measures on the ballot and approve them by majority vote. Ariz. Const. art. 4, Pt. 1 § 1(1)–(2), (5). Although the people retain their legislative power, it is not without limit. The constitution also provides that "[a]ny law which may be enacted by the Legislature under this Constitution may be enacted by the people under the Initiative. Any law which may not be enacted by the Legislature under this Constitution shall not be enacted by the people." Ariz. Const. art. 22, § 14.

¶56 Acting through this initiative power, the people proposed and ratified the Arizona Constitution's Tax Enactment Clause in 1992. Ariz. Const. art. 9, § 22. That clause requires that

> An act that provides for a net increase in state revenues . . . is effective on the affirmative vote of two-thirds of the members of each house of the legislature. If the act receives such an affirmative vote, it becomes effective immediately on the signature of the governor as provided by article IV, part 1, § 1. If the governor vetoes the measure, it shall not become effective unless it is approved by an affirmative vote of three-fourths of the members of each house of the legislature.

Ariz. Const. art. 9, § 22(A). The bicameralism, presentment, and supermajority requirements found in this clause apply to "any act that provides for a net increase in state revenues in the form of . . . [t]he imposition of any new tax." Ariz. Const. art. 9, § 22(B)(1).

¶57 Because Prop. 208 imposed a new tax, the issue is whether such an initiative is an "act" subject to the requirements of the Tax

Enactment Clause.  Fann contends that Prop. 208 is invalid because the Tax Enactment Clause either (1) removes the people's ability to raise taxes through statutory initiative; or (2) requires that a tax increase via statutory initiative receive a two-thirds supermajority vote of the people to pass.  We disagree.

¶58     At the outset, we note that the Court has not always been clear on the difference between acts of the legislature and measures passed by popular initiative.  At times we have suggested a bifurcation between acts, which the legislature passes, and measures, which the people pass through initiative; but we have not been consistent in our usage.  *Compare Barth v. White*, 40 Ariz. 548, 556 (1932) ("If it be true that the Legislature, which must submit an amendment either by an act or joint resolution, is not subject to such limitations, much less would it seem to be that an initiative petition by the people, which is neither an act nor joint resolution, should be subject thereto."); *and Ariz. Chamber of Com. & Indus. v. Kiley*, 242 Ariz. 533, 541 ¶ 33 (2017) ("The Rule applies to 'act[s],' which are enacted by the legislature, and does not address initiative or referendum petitions.") (quoting *Barth*, 40 Ariz. at 556); *with Saggio v. Connelly*, 147 Ariz. 240, 241 (1985) ("Legislation, whether by the people or the legislature, is a definite, specific act or resolution."); *and Kerby v. Griffin*, 48 Ariz. 434, 446 (1936) ("[A]n act approved by the people in a manner contrary to that provided by the Constitution is just as invalid as an act passed by the Legislature in a manner prohibited by constitutional mandates." (emphasis removed)).  Today we clarify that the term "act" applies to legislative acts only, and does not apply to voter initiatives.

¶59     When interpreting a constitutional provision, "we begin with the text" because it is "the best and most reliable index of a [provision's] meaning."  *State v. Christian*, 205 Ariz. 64, 66 ¶ 6 (2003).  We will not depart from the provision's language if it is clear and unambiguous.  *Id.*  By its plain language, the Tax Enactment Clause applies to "acts" that require a vote of the "legislature."  It reflects the electorate's intent to make it more difficult for the legislature to increase taxes.  But § 22 is silent on the topic of voter initiatives, even though it could have easily been written broadly enough to foreclose tax increases by statutory initiatives.

¶60     Moreover, the meaning of words in our constitution must be drawn from the context in which they are used and considered in light of the document as a whole.  *Kilpatrick v. Superior Court*, 105 Ariz. 413, 419

(1970). And we presume a word or phrase bears the same meaning throughout a text. *See Obregon v. Indus. Comm'n of Ariz.*, 217 Ariz. 612, 616 ¶ 21 (App. 2008).

**¶61** The Arizona Constitution repeatedly labels the legislature's enactments differently than enactments by initiative. The constitution uses both "measure" and "act" to describe the actions of the state legislature. *See, e.g.*, Ariz. Const. art. 4, pt. 2, § 25(2) (giving the legislature the power to "[a]dopt such other *measures* as may be necessary and proper (emphasis added)); *id*. art. 9, § 17(3) (permitting the legislature to override certain rules by supermajority vote "on each *measure*" subject to that rule (emphasis added)); *id*. art. 4, pt. 1 § 1(3) ("[N]o *act* passed by the legislature shall be operative for ninety days after the close of the session of the legislature enacting such *measure*." (emphasis added)). Yet, the converse is not true: In provisions that apply to enactments by initiatives, the Constitution uses only the term "measures." *See, e.g., id.* art. 4, pt. 1, § 1(2) (reserving the power to "propose any measure"); *id.* § 1(4) (describing "the measures so proposed to be voted on"); *id.* § 1(5) (stating the effective date for "[a]ny measure or amendment to the constitution proposed under the initiative"); *id.* § 1(6)(A) (Governor's veto power "shall not extend to an initiative measure"); *id., id.* § 1(6)(B) (limiting Legislature's authority over "an initiative measure"). This compels the conclusion that the word "act" does not apply to voter initiatives.

**¶62** By using the word "act" in section 22, then, the provision's drafters indicated their intent that the provision would apply to the legislative process, not to the initiative process. *See Biggs v. Betlach*, 243 Ariz. 256, 262 ¶ 30 (2017) ("In approving [the Tax Enactment Clause], the voters limited the *legislature's* ability to itself increase state revenues through taxes, fees, or assessments." (emphasis added)).

**¶63** Furthermore, it would be inappropriate to construe the Tax Enactment Clause to repeal voters' rights to raise taxes by initiative, which they certainly possessed before adding that clause to the Constitution. "[R]epeals by implication are not favored, and will not be indulged, if there is any other reasonable construction." *S. Pac. Co. v. Gila Cnty.*, 56 Ariz. 499, 502 (1941) (citation omitted). Here, there is a reasonable construction: section 22 restricts the legislature's power, not the people's. This construction is particularly appropriate in the context of the right to public democracy, a right understood by both this Court and the legislature to be

fundamental. *Direct Sellers Ass'n v. McBrayer*, 109 Ariz. 3, 6 (1972). The Revenue Source Rule[9] (passed by initiative in 2004) and *Arizona Chamber of Commerce & Industry v. Kiley* support our conclusion that citizens retain the right to raise taxes through the initiative process. 242 Ariz. at 542 (we noted that the Single Subject Rule "applies to 'acts[s],' which are enacted by the legislature, and does not address initiative or referendum petitions" (quoting *Barth*, 40 Ariz.at 556)); *see also Hoffman v. Reagan*, 245 Ariz. 313, 316 ¶ 12 (2018) (holding that the single subject rule applies to legislative acts but not initiatives or referendum petitions).

**¶64**　　　　In short, "acts" encompass only legislative enactments, and not voter measures. And the application of the presumption against implied repeal prevents us from removing the people's power to pass taxes via statutory initiative. Thus, Prop. 208 does not run afoul of the Tax Enactment Clause because that clause has no application here.

## III.  CONCLUSION

**¶65**　　　　For the reasons set forth above, we affirm the trial court's denial of a preliminary injunction enjoining Prop. 208 and remand to the trial court for further proceedings, consistent herewith, to determine whether Prop. 208 revenues will exceed the expenditure limitation on local revenues in article 9, section 21 of the Arizona Constitution.

---

[9] The Revenue Source Rule provides that if an intitative or referendum measure proposes some new or increased state spending, it must also include a source of those funds sufficient to cover the entire immediate and future costs of such proposed spending. *See* Ariz. const. art. 9, § 23.

TIMMER, VCJ., concurring in part, dissenting in part.

**¶66** The issue here is whether the trial court abused its discretion by refusing to temporarily enjoin Prop. 208. I agree with my colleagues that the court did not err, and I therefore join them in affirming that ruling. Fann has not shown that Prop. 208 is facially unconstitutional. But because I disagree with the majority's severability analysis and the framework imposed on the trial court for deciding whether Prop. 208 is unconstitutional, almost certainly dooming the measure, I dissent from that part of the opinion.

**¶67** A.R.S. § 15-1285(1) provides that Prop. 208 monies "[a]re not considered local revenues" for purposes of the Education Expenditure Clause, Ariz. Const. art. 9, § 21. More broadly, § 15-1285(2) exempts Prop. 208 monies "from any budgetary, expenditure or revenue control limit" that would impede accepting and spending those monies. I agree with the majority that the Education Expenditure Clause applies to Prop. 208 monies, and the voters could not avoid this application by redefining "local revenues." *See Kunes v. Samaritan Health Serv.*, 121 Ariz. 413, 415 (1979) (concluding the legislature could not expand its constitutional authority to exempt "[p]roperty of" charitable associations by "redefining the term 'property of' to include leased property"); *Tillotson v. Frohmiller*, 34 Ariz. 394, 401–02 (1928) ("[T]he people are bound by the Constitution, the same as the Legislature."). Notably, Invest in Education does not argue otherwise. Section 15-1285(1) is facially unconstitutional and thus entirely void because there are no circumstances in which it could validly operate; the provision could never exempt Prop. 208 monies from the Education Expenditure Clause. *See State v. Wein*, 244 Ariz. 22, 31 ¶ 34 (2018) ("To succeed on a facial challenge . . . 'the challenger must establish that no set of circumstances exists under which the Act would be valid.'" (quoting *United States v. Salerno*, 481 U.S. 739, 745 (1987))). Because § 15-1285(2) could apply to *statutory* limits without violating the constitution, it is not facially unconstitutional and is therefore operable, *see id.*, although it could not apply to prevent the Education Expenditure Clause's application, *see State v. Havatone*, 241 Ariz. 506, 509 ¶ 13 (2017) (finding a statute unconstitutional only "as applied" in particular circumstances); *see also Ayotte v. Planned Parenthood of N. New England*, 546 U.S. 320, 329 (2006) ("It is axiomatic that a 'statute may be invalid as applied to one state of facts and yet valid as applied to another.'" (quoting *Dahnke-Walker Milling Co. v. Bondurant*, 257 U.S. 282, 289 (1921))).

**¶68** Can § 15-1285(1) be severed from the remaining Prop. 208 provisions, thereby leaving them intact? In my view, yes. The severability inquiry focuses on the interconnectedness of the unconstitutional provision with the remaining provisions. *See Randolph v. Groscost*, 195 Ariz. 423, 427 ¶ 15 (1999) (asking whether the remaining provision "can operate independently and is enforceable and workable" without "produc[ing] a result so irrational or absurd as to compel the conclusion that an informed electorate would not have adopted one portion without the other"). It does not ask whether other, unrelated challenges exist that would affect the validity of the remaining provisions. Here, eliminating § 15-1285(1) does not itself affect the independent operation, enforceability, or workability of Prop. 208's remaining provisions, even if separate challenges remain to the efficacy of the transfer and allocation provisions. This lack of impact also means that leaving Prop. 208 intact without § 15-1285(1) is neither absurd nor irrational. Thus, I disagree with the majority's severability analysis concerning § 15-1285(1), which depends entirely on the success of the separate legal challenge to Prop. 208's transfer and allocation provisions, A.R.S. § 15-1281(D)(1)–(3). *See supra* ¶ 39 (concluding that "severance of the unconstitutional provisions strikes A.R.S. § 15-1281(D)(1), (2), and (3) from the statute," leaving Prop. 208 without authority to spend most of the tax revenues and therefore rendering it unworkable).

**¶69** After § 15-1285(1) falls away, the next issue is whether Prop. 208's transfer and allocation provisions are facially unconstitutional by violating the Education Expenditure Clause and, if so, whether they can be severed from the remaining provisions. Deciding whether to sever a statutory *provision* only comes into play if the provision is facially unconstitutional and thus void in all applications. *Cf. Havatone*, 241 Ariz. at 509–10 ¶¶ 13, 18 (holding that a provision in a DUI statute was unconstitutional as applied to the facts there but stating, "[o]ur decision does not vitiate" that provision because it could be validly applied in other circumstances). If the provision is unconstitutional as applied under particular circumstances, that *application* is severed from the statute, but the provision itself otherwise remains part of the statute and operable. *See id.*; *see also Jackson v. State*, 883 N.W.2d 272, 281 (Minn. 2016) ("Under as-applied severance, a statutory provision is severed only as applied to a certain class of person to prevent unconstitutional applications.").

¶70        I agree with the trial court that Fann has not shown a likelihood she will prevail on her argument that the transfer and allocation provisions are facially unconstitutional.  *See Wein*, 244 Ariz. at 26 ¶ 10 (stating that the challenging party bears the burden of demonstrating that a provision is facially unconstitutional).  First, although the provisions direct the state treasurer to transfer Prop. 208 monies to school districts and charter schools, the provisions themselves do not require districts and schools to spend those monies, much less require them to exceed the expenditure limitations.  *See* § 15-1281(D)(1)–(3).  Thus, per their plain language, the provisions do not conflict with the Education Expenditure Clause, which does not address pre-expenditure allocations by the treasurer.  *See Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 449–50 (2008) (cautioning courts to "be careful not to go beyond the statute's facial requirements" when determining whether a statute is facially unconstitutional).

¶71        Second, even assuming the transfer and allocation provisions implicitly direct expenditures that could exceed constitutional limitations, Fann has not shown there are no circumstances in which expenditures could be made in compliance with the Education Expenditure Clause.  *See Wein*, 244 Ariz. at 31 ¶ 34.  Expenditures of Prop. 208 monies could be made in compliance with the Education Expenditure Clause until aggregate and local school district limitations are met; the constitution would not be offended by permitting expenditures of Prop. 208 monies falling under the limitations cap.  *See supra* ¶ 53 (citing evidence that school expenditures fell $144,156,539 short of the limitations cap in fiscal year 2020–21); *cf. United States v. Arthrex, Inc.*, 141 S. Ct. 1970, 1986 (2021) ("In general, 'when confronting a constitutional flaw in a statute, we try to limit the solution to the problem' by disregarding the 'problematic portions while leaving the remainder intact.'"  (quoting *Ayotte*, 546 U.S. at 328–29)); *Ayotte*, 546 U.S. at 329 ("[T]he 'normal rule' is that 'partial, rather than facial, invalidation is the required course,' such that a 'statute may . . . be declared invalid to the extent that it reaches too far, but otherwise left intact.'"  (quoting *Brockett v. Spokane Arcades, Inc.*, 472 U.S. 491, 504 (1985))).

¶72        Most significantly, the Education Expenditure Clause permits expenditures in excess of limitations if authorized by a supermajority of the legislature (aggregate expenditure limitation) or a majority of school district electors voting on the excess expenditures (local school district

expenditure limitation). *See* Ariz. Const. art. 9, § 20 (3) & (7). Thus, the Education Expenditure Clause is only violated if excess expenditures are unauthorized. *See id.* Such authorizations are not as far-fetched as the majority suggests, as evidenced by the fact the legislature has authorized excess expenditures twice in the last twenty years. *See supra* ¶ 48.

¶73 Fann has not shown that expenditures of Prop. 208 monies can never be made under the limitation cap or that the legislature/electors will never authorize excess expenditures, and it is unlikely she will be able to do so. Although expenditures in excess of limitations would be unconstitutional absent authorization, the result would be to render the transfer and allocation provisions (assuming they are spending provisions) unconstitutional as applied to the excess expenditures. *See Havatone*, 241 Ariz. at 509 ¶ 13. The provisions themselves would remain operable and determining whether they could be severed in their entirety would be inappropriate. *See id.* at 510 ¶ 18; *see also Ayotte*, 546 U.S. at 328–29 (acknowledging that "[a] ruling of unconstitutionality frustrates the intent of the elected representatives of the people," and stating preference to "enjoin only the unconstitutional applications of a statute while leaving other applications in force" (quoting *Regan v. Time, Inc.*, 468 U.S. 641, 652 (1984) (plurality opinion))).

¶74 The majority concludes that if a "material" amount of Prop. 208 monies are allocated in excess of the expenditure limitations, the transfer and allocation provisions are unconstitutional in all their applications and cannot be severed to leave the remainder of Prop. 208 intact. They make no allowances for under-the-cap expenditures or constitutionally authorized exceptions. And because the remainder of Prop. 208 would be rendered unworkable and absurd, it concludes the entire statutory scheme is unconstitutional. *See supra* ¶¶ 52–54. The majority therefore directs the trial court to determine whether Prop. 208 will generate tax revenues that exceed the expenditure limitations and result in an accumulation of monies that cannot be spent. If so, the court must declare the entirety of Prop. 208 unconstitutional and enjoin its operation. *See supra* ¶ 54.

¶75 The flaw in the majority's analysis, in my view, is directing the trial court to employ an as-applied inquiry that examines currently existing financial projections (simultaneously ignoring whether the

legislature/school district electors could exercise their constitutionally authorized ability to permit excess expenditures) to determine whether the transfer and allocation provisions are facially unconstitutional. This paradigm eliminates the distinction between as-applied and facial challenges that our courts have regularly recognized. As explained, even if Prop. 208 monies are eventually allocated in excess of the expenditure limitations, the transfer and allocation provisions are not facially unconstitutional because Fann has not shown that the provisions would be unconstitutional in all their applications. *See Wein*, 244 Ariz. at 31 ¶ 34.

**¶76** In response, the majority acknowledges that the transfer and allocation provisions "might be operable in other circumstances" even though they may be unconstitutional as applied to violate the expenditure limitation. *See supra* ¶ 43. They attempt to rebut my concerns by stating that the latter situation nevertheless "requires us to analyze severability, even in an as-applied challenge." *Id.* I disagree.

**¶77** First, Fann has never made an as-applied challenge, and this Court should not effectively create one and then resolve it. *See State ex rel. Brnovich v. City of Tucson*, 242 Ariz. 588, 599–600 ¶ 45 (2017) (explaining that the Court generally abstains from deciding issues not raised or argued by the parties). From the start, she has argued only that § 15-1285 and the transfer and allocation provisions are *facially* unconstitutional and cannot be severed to save the rest of Prop. 208. *See* Verified Special Action Complaint, ¶¶ 3, 35–40, 56–61; Motion for Temporary Restraining Order (With Notice) and Preliminary Injunctive Relief at pp. 1, 3–7; *see also* Minute Entry Ruling, February 5, 2021 at 14 (characterizing Fann's challenge as a facial one and analyzing whether she had shown that "Proposition 208 will cause the spending caps to be breached under every conceivable scenario"). Similarly, Fann did not cast her arguments before this Court as an as-applied challenge.

**¶78** Second, the majority announces a new principle without explanation or analysis by stating it must determine whether *the entirety* of the transfer and spending provisions can be severed from Prop. 208 even though the provisions can be constitutionally applied in some circumstances. *See supra* ¶ 43. It cites two court of appeals' opinions to support this principle, but neither is helpful. *See id.* After deciding that the statutes at issue could not constitutionally apply in certain circumstances,

these courts severed statutory provisions relating *only* to those circumstances; they left intact all provisions that could be constitutionally applied. *See Empress Adult Video & Bookstore v. City of Tucson*, 204 Ariz. 50, 65–66 ¶ 43 (App. 2002) (declaring a statute governing business operating hours unconstitutional as applied to adult speech but not nude dancing and then severing "adult arcade, adult bookstore or video store, and adult motion picture theater from § 13-1422, the invalid portions pertaining to adult speech, [and] leav[ing] adult theater, the valid portion pertaining to nude dancing"), *disapproved on other grounds*, *State v. Stummer*, 219 Ariz. 137, 144 ¶ 22 & n.6 (2008); *State v. Snyder*, 25 Ariz. App. 406, 408-09 (1976) (concluding that even assuming a statute criminalizing lewd and lascivious acts is constitutionally overbroad as to acts between adults, the language addressing adults could be severed, leaving the constitutional part involving child victims intact). Neither case involved the situation here where the challenged provisions could be both constitutional and unconstitutional, depending on the circumstances. Declaring all of Prop. 208 unconstitutional throws out the constitutional baby with the unconstitutional bathwater. *See Ayotte*, 546 U.S. at 328–29.

¶79      Today's decision marks a departure from our previous decisions, which have held that although a statutory provision is unconstitutional as applied in particular circumstances, it remains in place for constitutional application in others. *See, e.g.*, *State ex rel. Brnovich v. City of Tucson*, 251 Ariz. 45, 53 ¶ 33 (2021) (holding that statute requiring "political subdivisions" to consolidate local, state, and national elections after low voter turnout in a local election was unconstitutional as applied to charter cities whose charters require separate local elections but otherwise constitutionally applies to non-charter cities and charter cities without conflicting charters); *Ansley v. Banner Health Network*, 248 Ariz. 143, 152 ¶ 36 (2020) (holding that hospital lien statutes are unconstitutional as applied to secure payment from third-party tortfeasors for bills generated by Medicaid patients but not as applied to those generated by non-Medicaid patients); *Havatone*, 241 Ariz. at 509–10 ¶¶ 13, 18 (holding that the unconscious clause of the implied consent DUI statute was unconstitutional except when applied when exigent circumstances prevented officers from getting a warrant). Of course, severability was not at issue in these cases because the challenged provisions remained viable. By invalidating the transfer and allocation provisions entirely because they could be unconstitutional as applied in some circumstances, the majority abruptly

KAREN FANN ET AL. V. STATE OF ARIZONA ET AL.
VICE CHIEF JUSTICE TIMMER, concurring in part, dissenting in part

shifts from this well-accepted principle. It compounds the conflict by applying the *Randolph* test to find that the remainder of Prop. 208 cannot operate without the transfer and allocation provisions and doing so would be absurd, making all of Prop. 208 unconstitutional. *See supra* ¶¶ 40–41. Before the Court invalidates an initiative that has constitutional application, some explanation for the new analytical paradigm is in order.

**¶80**         Would voters have enacted Prop. 208 had they known that a material amount of generated tax funds could languish in state accounts unless excess expenditures were authorized? Maybe, maybe not. Perhaps they were willing to risk having Prop. 208 "lurch along," counting on the legislature to authorize exceeding the expenditure cap and avoid needlessly accumulating "hundreds of millions of dollars in unspent revenues." *See supra* ¶ 43. Perhaps not. But there is no vehicle for making such inquiries because Fann has not shown that the transfer and allocation provisions are facially unconstitutional, which would prompt a severability analysis under *Randolph*. The likelihood of successful as-applied challenges should not be used as a backdoor pathway for declaring an entire initiative unconstitutional and void.

**¶81**         Although I agree that the trial court's denial of a temporary injunction should be affirmed, I respectfully disagree with the majority's severance and constitutionality analysis and dissent as to those parts of the opinion.